713 F.2d 546
 Fidel RAMOS, David Lee Anderson; Sadiki Lisimba Ajamu,
a/k/a Eugene Collins; Alexander Ruses; Mark J. Menchetti;
Lester Lazenby; and all persons who are now or in the
future may be incarcerated in the Maximum Security Unit of
the Colorado State Penitentiary at Canon City, Colorado,
Plaintiffs-Appellees, Cross-Appellants,
v.
Richard D. LAMM, James G. Ricketts; Allen L. Ault; John
Perko; Edgar Fox; William Wilson, Superintendent, Maximum
Security Unit; Harold Henson, Housing Manager, Maximum
Security Unit; Captain W. Fox, Cellhouse One Supervision,
Maximum Security Unit, Colorado State Prison,
Defendants-Appellants, Cross-Appellees.
 Nos. 82-1531, 82-1544.
 United States Court of Appeals,
Tenth Circuit.
 June 15, 1983.
Rehearing Denied Aug. 23, 1983.
 
 David K. Rees, Asst. Atty. Gen., Denver, Colo. (J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., and Mary J. Mullarkey, Sol. Gen., State of Colorado, Denver, Colo., with him on the briefs), for defendants-appellants, cross-appellees.
 Edwin S. Kahn of Kelly, Haglund, Garnsey & Kahn, Denver, Colo. (ACLU Foundation of Colorado, Inc.), for plaintiffs-appellees, cross-appellants.
 Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 This appeal involves the award of attorney's fees and expenses to the plaintiffs in a civil rights class action in which the district court held that conditions in the maximum security unit of the Colorado State Penitentiary at Canon City deprived prisoners of rights protected by the Eighth and Fourteenth Amendments. Ruling on applications submitted by the plaintiffs pursuant to 42 U.S.C. § 1988, the court awarded $709,933.50 in attorney's fees and $32,782.43 in expenses allowable as costs. The defendants have appealed that judgment, arguing that the court abused its discretion in awarding those amounts. The plaintiffs have cross-appealed, claiming that an additional $73,939.16 in out-of-pocket expenses should have been allowed.
 
 
 2
 Plaintiff Fidel Ramos filed a pro se complaint in November 1977 challenging the constitutionality of conditions in the maximum security unit of the penitentiary. The American Civil Liberties Union Foundation of Colorado, the National Prison Project, and the Colorado Coalition of Legal Services entered appearances as counsel for the plaintiff in March 1978 and obtained certification of the case as a class action on behalf of all maximum security prisoners. Following extensive discovery and a five-week trial, the district court ruled that the conditions at the facility deprived the prisoners of constitutional rights. Ramos v. Lamm, 485 F.Supp. 122 (D.Colo.1979). The district court held the following conditions at the prison to be unconstitutional: (1) an inadequate physical environment because of lack of sanitation, heat, ventilation, lighting, and plumbing; (2) lack of prisoner safety because of the physical layout of the prison and inadequate staff supervision; (3) idleness and lack of exercise; (4) inadequate medical attention; (5) an arbitrary classification system; (6) overly broad visitation restrictions; (7) excessive restrictions on correspondence; and (8) insufficient access to the courts because the law library was inadequate and insufficient time was permitted for library use.
 
 
 3
 The conditions at the maximum security unit had been the subject of inquiry prior to the filing of this suit. In 1973 the facility was found to be "outdated" and "unmanageable" by a task force of the American Correctional Association. A report by the Attorney General of Colorado in 1975 concurred in that finding. In February 1977 a plan submitted to the Colorado legislature recommended that use of the facility be phased out. Prior to commencement of this suit the legislature had made initial appropriations to build a new maximum security prison, which was to be completed in January or February 1981. The district court noted the steps that the state had taken toward building a new facility, but ruled that these steps did not eliminate the constitutional infirmity of the conditions under which the prisoners were being held. The court also noted that some of the violations would continue in the new facility. The court ordered that the prison be closed unless immediate steps were taken to remedy the existing constitutional violations.
 
 
 4
 The defendants appealed the judgment and order of the district court. This Court affirmed the judgment with regard to: (1) the physical environment--including considerations of shelter, sanitation, and food preparation; (2) prisoner safety because of physical layout and staff supervision; (3) medical care; (4) correspondence; and (5) access to the courts. We vacated the district court's conclusion regarding visitation and the portions of the court's remedial order relating to idleness, motility, and classification. We remanded for reconsideration of the remedy in light of the progress being made on the new facility. Ramos v. Lamm, 639 F.2d 559 (10th Cir.1980). Both the plaintiffs and the defendants unsuccessfully petitioned for writs of certiorari from the Supreme Court. 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). On remand, in August 1981, the district court affirmed its order of closure, noting that the facility remained unfit for human habitation. The court also issued an order approving the stipulations of the parties concerning remedies for the shelter, sanitation, safety, and medical care violations. Ramos v. Lamm, 520 F.Supp. 1059, 1062 (D.Colo.1981). No appeal was taken from this order.
 
 
 5
 In December 1979, immediately after the original trial, the plaintiffs submitted a request for an interim allowance of attorney's fees; the request was updated several times before the court made its award in March 1982. In this appeal the defendants claim that the trial court abused its discretion by awarding fees for too many hours and by applying an excessive rate of compensation. They also claim that certain of the expenses allowed by the district court were improper. The plaintiffs assert in their cross-appeal that they should have been reimbursed all out-of-pocket expenses.
 
 
 6
 In its opinion the district court extensively reviewed Tenth Circuit and other decisions involving attorney's fees. It criticized the opinions for being inconsistent and pleaded for specific guidelines for district courts to apply in setting fee awards. Ramos v. Lamm, 539 F.Supp. 730 (D.Colo.1982). We agree that more specific guidelines are necessary, and we proceed to set forth standards for district courts to follow in this and similar cases. In this endeavor we are aided by the Supreme Court's recent decision in Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).
 
 
 7
 * At the outset we dispose of two of the defendants' main contentions in this appeal. First, the defendants argue that fee awards to public interest lawyers, those employed by public interest organizations or those in private practice who donate their services to such organizations, should be calculated differently than awards to lawyers in private practice who would personally receive the benefit of the awards. We reject this contention. We agree with most courts that have considered the issue that calculating attorney's fees for public interest lawyers and private firm lawyers in the same manner furthers the legislative intent underlying 42 U.S.C. § 1988. See, e.g., Copeland v. Marshall, 641 F.2d 880, 899-900 (D.C.Cir.1980) (en banc); Palmigiano v. Garrahy, 616 F.2d 598, 601-03 (1st Cir.), cert. denied, 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980); Reynolds v. Coomey, 567 F.2d 1166, 1167 (1st Cir.1978); Torres v. Sachs, 538 F.2d 10, 13-14 (2d Cir.1976); see also New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 70 n. 9, 100 S.Ct. 2024, 2034 n. 9, 64 L.Ed.2d 723 (1980); Love v. Mayor of Cheyenne, 620 F.2d 235, 237 (10th Cir.1980) (citing Reynolds v. Coomey ). When Congress enacted § 1988 it made no distinction between the compensation to be awarded to private lawyers and that to be awarded to lawyers working in public interest law firms. The Senate Report accompanying the bill cited with approval two cases holding that the fees should be calculated in the same manner. Sen.Rep. No. 1011, 94th Cong., 2d Sess. 6, reprinted in 1976 U.S.Code Cong. & Ad.News 5908, 5913 (citing Swann v. Charlotte-Mecklenburg Board of Education, 66 F.R.D. 483 (W.D.N.C.1975); Davis v. County of Los Angeles, 8 Empl.Prac.Dec. (CCH) p 9444 (C.D.Cal.1974)). The court in Swann noted that reasonable fees should be awarded in civil rights cases without regard to the lawyer's status as a "salaried employee[ ] of a legal aid agency." 66 F.R.D. at 486. The court in Davis was even more explicit:
 
 
 8
 "In determining the amount of the fees to be awarded, it is not legally relevant that plaintiffs' counsel ... are employed by the Center of Law In The Public Interest, a privately funded nonprofit public interest law firm. It is in the interest of the public that such law firms be awarded reasonable attorneys' fees to be computed in the traditional manner when its counsel perform legal services otherwise entitling them to the award of attorneys' fees."
 
 
 9
 8 Empl.Prac.Dec. p 9444, at 5049.
 
 
 10
 Section 1988 contemplates that both public interest lawyers and private law firms be provided with incentive to prosecute civil rights actions; the fee awards provide this incentive by increasing the ability and willingness of both groups to finance litigation they would otherwise be unable or unwilling to afford. To pay public interest firms less than private firms could frustrate the prosecution of civil rights litigation. Potential liability for full value fee awards can deter violations of the civil rights laws, especially in situations in which the fee award represents a significant portion of a defendant's financial exposure. Establishing a lower fee when public interest lawyers represent plaintiffs will reduce the incentive to eliminate violations, and will provide defendants with less incentive to settle and more incentive to engage in dilatory tactics than would be present if private firm lawyers were involved. See Copeland v. Marshall, 641 F.2d at 899. The legislative history and the general purposes underlying the awarding of attorney's fees indicates that congressional intent is best fulfilled by calculating the fees for these groups in the same manner.
 
 
 11
 The defendants' second contention is that attorney's fees should be decreased when the fees will come from public funds and hence ultimately from the taxpayers. This contention has already been rejected by this Court. See Battle v. Anderson, 614 F.2d 251, 257-58 (10th Cir.1980); see also Love v. Mayor of Cheyenne, 620 F.2d 235 (10th Cir.1980) (by implication). Much as the legislative history of § 1988 makes no distinction among parties who collect attorney's fees, so it makes no distinction among parties who pay them. See Sen.Rep. No. 1011. When Congress enacted the attorney's fee statute, it chose to award fees against governmental entities. Many civil rights actions are brought pursuant to 42 U.S.C. § 1983. Violations of this statute require action under color of state law; thus, a governmental entity will often be responsible for the payment of the fee. Reducing the potential award for a large group of defendants would counteract the congressional intent to induce civil rights enforcement in the same way reducing the awards for certain types of plaintiff's lawyers would frustrate that intent. We hold, therefore, that attorney's fees awarded against governmental units should be calculated in the same manner as those awarded against private parties. See generally Copeland v. Marshall, 641 F.2d at 894-95.
 
 II
 
 12
 In recent decisions we have referred to the factors for computing attorney's fee awards set out in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974) (cited with approval in Sen.Rep. No. 1011). See, e.g., Battle v. Anderson, 614 F.2d 251, 258 (10th Cir.1980); Francia v. White, 594 F.2d 778, 782 (10th Cir.1979); see also Hensley v. Eckerhart, --- U.S. at ---- - ----, 103 S.Ct. at 1937-38. In part we have done this to ensure that district courts articulate specific reasons for fee awards to give us an adequate basis for review. However, we recognize that while the factors set out in Johnson are useful, some are seldom applicable, and none is self-actuating: "Simply to articulate those twelve factors ... does not itself conjure up a reasonable dollar figure in the mind of a district judge. A formula is necessary to translate the relevant factors into terms of dollars and cents." Copeland v. Marshall, 641 F.2d at 890. Therefore, we provide guidance in assessing and applying the relevant factors to produce a monetary award.
 
 
 13
 * "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, --- U.S. at ----, 103 S.Ct. at 1939.Time
 
 
 14
 The first step in calculating fee awards is to determine the number of hours reasonably spent by counsel for the party seeking the fees.[1] In the future, district judges in this Circuit will inform lawyers that if they intend to seek attorney's fees under § 1988 they must keep meticulous, contemporaneous time records to present to the court upon request. These records must reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks--for example, how many hours were spent researching, how many interviewing the client, how many drafting the complaint, and so on.[2]
 
 
 15
 The district court must determine not just the actual hours expended by counsel, but which of those hours were reasonably expended in the litigation. When scrutinizing the actual hours reported, the district court should distinguish "raw" time from "hard" or "billable" time to determine the number of hours reasonably expended.
 
 
 16
 "Compiling raw totals spent, however, does not complete the inquiry. It does not follow that the amount of time actually expended is the amount of time reasonably expended. In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."
 
 
 17
 Copeland v. Marshall, 641 F.2d at 891 (emphasis in original).
 
 
 18
 In determining which hours reported were reasonably expended and hence are billable to the adversary, the court should examine the total number of hours reported by each lawyer. While some private firm lawyers bill more than 2000 hours per year, studies indicate that 1400 to 1600 billable hours per associate and 1200 to 1400 per partner represents the per annum norm that can actually be billed. See, e.g., ABA Standing Committee on Economics of Law Practice, Administrative and Financial Management in a Law Firm 2, 6 (Economics of Law Practice Series Pamphlet 10, 1965). These totals break down to six to seven billable hours per day for a five day week. During trials and other times of unusual stress the number of billable hours no doubt increases considerably. These studies reflect that normal workdays for lawyers include time to read general mail and advance sheets, to engage in nonbillable conversations with other lawyers, and to indulge in coffee breaks and other personal activities. The court should question reported time significantly in excess of the norm.
 
 
 19
 In examining the reasonableness of the hours reported, the district court should also examine hours allotted to specific tasks. First, the court should determine whether the tasks sought to be charged to the adverse party would normally be billed to a paying client. Lawyers charging fees to adversaries rather than clients may be less likely to carefully scrutinize the hours spent to determine if payment for the task performed is justified. Thus, it would not be surprising that reported hours would include time spent reading background cases, civil rights reporters, and other materials designed to familiarize the attorney with this area of the law--time that would be absorbed in a private firm's general overhead and for which the firm would not bill a client.
 
 
 20
 When examining the hours reported for tasks that are properly billable, the district court should evaluate the hours spent on each task to determine their reasonableness. In the instant case, for example, more than 100 hours were spent drafting the complaint. While this expenditure of time may have been reasonable, it demands explanation.[3] In determining what is a reasonable time in which to perform a given task or to prosecute the litigation as a whole, the court should consider that what is reasonable in a particular case can depend upon factors such as the complexity of the case, the number of reasonable strategies pursued, and the responses necessitated by the maneuvering of the other side.
 
 
 21
 Another factor the court should examine in determining the reasonableness of hours expended is the potential duplication of services. "For example, [if] three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time." Copeland v. Marshall, 641 F.2d at 891. Similarly, if the same task is performed by more than one lawyer, multiple compensation should be denied. The more lawyers representing a side of the litigation, the greater the likelihood will be for duplication of services. More than a dozen attorneys spent time on the instant litigation for the plaintiffs; at least five attorneys spent more than 200 hours each on the case and two spent more than 2000 hours each. Perhaps this expenditure of time was necessary, but the vast number of hours reported raises the question of duplication. Leading members of the profession have criticized the bar for the burgeoning expense of modern litigation and have attributed part of the problem to the practice of using several lawyers when one would suffice. The court should assess the possibility that reported hours include duplication by reviewing with particular care the number of lawyers present at hearings, depositions, and other discovery proceedings, and by evaluating the roles played by the lawyers in the litigation generally. The court can look to how many lawyers the other side utilized in similar situations as an indication of the effort required. Because utilizing more than one lawyer may be reasonable in some situations, such as during settlement conferences or during trial,[4] we decline to require an automatic reduction of reported hours to adjust for multiple representation or potential duplication. However, the district court should give particular attention to the possibility of duplication.
 
 
 22
 In sum, the district court must carefully scrutinize the total number of hours reported to arrive at the number of hours that can reasonably be charged to the losing party, much as a senior partner in a private firm would review the reports of subordinate attorneys when billing clients whose fee arrangement requires a detailed report of hours expended and work done.
 
 Reasonable Hourly Rate
 
 23
 The first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time.[5] If the lawyer seeking the fee is in private practice, his or her customary rate would be a relevant but not conclusive factor. The hourly rate should be based on the lawyers' skill and experience in civil rights or analogous litigation. Lawyers working outside their fields of expertise may deserve an hourly fee lower than their normal billing rate because of their lack of experience in the civil rights field. Salaried public interest firm lawyers should be assigned a billing rate equal to their counterparts in expertise in private practice. The quality of the lawyer's performance in the case should also be considered in placing a value on his or her services.[6]
 
 
 24
 The hourly rate at which compensation is awarded should reflect rates in effect at the time the fee is being established by the court, rather than those in effect at the time the services were performed. The lawyers seeking fees usually will not have been paid for their services until the court makes its allowance. We think that awarding compensation at current rates will roughly approximate periodic compensation adjusted for inflation and interest and will obviate the necessity of guessing when periodic billings would have been made and paid in an analogous private practice situation. Generally, no prejudgment interest should be paid for the period before the fees are awarded.
 
 
 25
 Absent more unusual circumstances than we see in this case, the fee rates of the local area should be applied even when the lawyers seeking fees are from another area. In every major metropolitan area there are a substantial number of lawyers who possess the skill to handle all but the most unusual civil rights cases. More than one-sixth of all civil cases filed in federal court last year were civil rights suits. See Annual Report of the Director of the Administrative Office of United States Courts, 215-16 (1982). More than 30% of the cases appealed to the United States Courts of Appeals last year were civil rights cases. Id. at 207-08. This volume of litigation indicates that civil rights litigation has become a common specialty. We do not think that a prison conditions case such as the one at issue here is so unusual or requires such special skills that it could not be handled by reasonably competent trial lawyers in Denver or any other metropolitan area. Most other substantive areas of civil rights law have become sufficiently familiar that reasonably competent lawyers who do civil rights work should be able to function at both the trial and appellate level.
 
 
 26
 Thus, the court should establish, from the information provided to it and from its own analysis of the level of performance and skills of each lawyer whose work is to be compensated, a billing rate for each lawyer based upon the norm for comparable private firm lawyers in the area in which the court sits calculated as of the time the court awards fees.B
 
 Reductions of Fees
 
 27
 If a plaintiff does not prevail on all claims for relief, the court must determine whether an adjustment is necessary. The Supreme Court has declared that if a plaintiff fails to prevail on claims "unrelated" to those on which he or she succeeds, work on the unrelated unsuccessful claims cannot be compensated. Hensley v. Eckerhart, --- U.S. at ----, 103 S.Ct. at 1940. These claims are to be treated as if raised in a separate lawsuit that the plaintiff lost. Id.
 
 
 28
 More difficult are those cases in which the plaintiff's claims involve "a common core of facts or [are] based on related legal theories" and cannot be viewed as a series of discrete claims. Id. In such cases the court must focus on the significance of the overall relief obtained by the plaintiff. If the plaintiff has obtained "excellent results," the attorney's fees should encompass all hours reasonably expended; no reduction should be made because the plaintiff failed to prevail on every contention: "The result is what matters." Id. (footnote omitted). If a plaintiff has achieved "only partial or limited success," then even though the plaintiff's claims were "interrelated, nonfrivolous, and raised in good faith," an award determined by multiplying the hours reasonably expended on the whole litigation by a reasonable hourly rate may be excessive: "Again, the most critical factor is the degree of success obtained." Id.
 
 
 29
 "There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified."
 
 
 30
 Id.
 
 
 31
 With appropriate time records we think the court will not have much difficulty determining how much time was spent on unrelated claims for which no compensation may be awarded. If a plaintiff wins but is not fully satisfied with the trial court's grant of relief, takes an appeal, and loses, or, as here, unsuccessfully petitions for certiorari, the court must consider whether that work is on an unrelated issue that may not be compensated. Generally, we believe appeals and certiorari petitions should not be treated as unrelated if they are based upon common facts or legal theories intertwined with those on which the plaintiff has prevailed.
 
 
 32
 The hard cases will be those in which the court must determine whether "excellent results" were achieved even though some interrelated theories urged by the plaintiff were unsuccessful or whether reductions in fees are required because the plaintiff's successes were only "partial or limited." The members of this panel strongly believe that a number of the issues in the case before us should not have been litigated. Had the state defendants not decided to stonewall on all issues, or had the trial court taken a more restrictive view of the issues it would consider during the period before the new prison was ready, this case would have a different posture. But the question before us is whether the plaintiffs acted reasonably under the circumstances facing them and whether they achieved "excellent results" on what were clearly nonfrivolous, interrelated theories based upon a common core of facts. The plaintiffs won an almost complete victory in the district court. On appeal we reversed three of eight conclusions of the district court concerning constitutionality and vacated portions of the court's remedial order. On remand the trial court should consider whether some adjustment will be necessary based upon the "results obtained" factor. Hensley v. Eckerhart contemplates that this decision should first be made by the district court "in light of the considerations ... identified." --- U.S. at ----, 103 S.Ct. at 1941.[7]
 
 
 33
 Some courts have reduced fees when the thrust of the suit was for monetary recovery and the recovery was small compared to the fees counsel would have received if compensated at a normal rate for hours reasonably expended. We reject this practice. The amount of the monetary recovery is not as significant as the policy being vindicated. Section 1988 was designed to encourage private enforcement of the civil rights laws. Parties acting as private attorneys general should be reasonably compensated for their vindication of the public policy even if they themselves do not receive a large financial benefit. If the court has the impression that a plaintiff spent an excessive amount of lawyer time and simply overwhelmed the defendant in a case in which the litigation onslaught was unnecessary, the court should consider this factor in determining what amount of time was reasonably expended in the litigation. It should not be expressed as a requirement that the fee award have a particular relationship to the amount of the monetary recovery.
 
 C
 Enhancement of Normal Fees
 
 34
 The Court in Hensley v. Eckerhart acknowledged that an enhanced fee award could be made in cases in which the success achieved was exceptional.[8] We think the Court does not foreclose enhancement above that given for an "excellent result" in cases in which plaintiff did not win on all issues. "Exceptional success" justifying an enhanced fee may be based upon the performance of counsel--for example, victory under unusually difficult circumstances or with an extraordinary economy of time--or upon the result achieved--total victory or establishment of significant new law.
 
 
 35
 We do not discount the possibility that in a particular case the plaintiff's lawyers may have performed so brilliantly that extraordinary compensation is warranted. But we think that this genius factor diminishes and eventually disappears as the number of hours expended on the case increases. A brilliant idea may shortcut one aspect of the case and save many hours, but in protracted litigation a lawyer is also likely to pursue blind alleys and expend many unproductive hours. In a case such as the one at bar, in which more than 9000 hours were reported, we do not believe that any adjustment for extraordinary performance could be warranted. We also believe that the greater the number of attorneys involved on a side, the less likely it is that an extraordinary performance bonus is appropriate. Here the plaintiffs utilized 12 attorneys, 5 of whom expended more than 200 hours. In such a case it is unlikely that the genius of one lawyer will so affect the case that a bonus would be warranted. Furthermore, in awarding a genius bonus the district court should take care not to duplicate the skill reflected in the attorney's billing rate. Thus, we believe that bonuses or multipliers of the normal fee because of the extraordinary skill of counsel should be rarely awarded, and should be confined to cases in which the bulk of the work was done by a single attorney who exhibits extraordinary skill or to cases in which the work was done well in a relatively short time given the complexity of the task.
 
 
 36
 Another enhancement factor often mentioned is the undesirability of the case. Because civil rights cases now comprise a large part of all federal trial and appellate litigation, a significant portion of the bar is regularly participating in civil rights litigation; thus, no real stigma remains associated with these cases. Situations in which great courage is required to undertake a case, like that confronting the fictional lawyer in To Kill a Mockingbird, may still exist. But a bonus for the social stigma assumed by a lawyer participating in civil rights litigation should rarely be given.
 
 
 37
 The contingency factor as a basis for enhancement also must be viewed with caution. Some courts appear to give a multiplier or bonus simply because the lawyers would have received nothing had they not won and some chance of losing always exists. The court should first determine, by requiring the party to reveal the fee arrangement, whether the lawyers really would have recovered fees only if they prevailed or whether the client would have paid some fee regardless of the outcome. Lawyers who are to be paid whether they win or lose have a weak claim to a multiplier based on the risk of loss.[9] Second, when the court has decided to award fees for hours spent on theories a plaintiff has pressed unsuccessfully, in a sense it is giving something of a contingency bonus and should remember that when contemplating a multiplier or additional bonus. Third, when determining whether to give a contingency bonus, the trial court should view the litigation as it reasonably should have appeared to the lawyers at the outset of the litigation. In the instant case, given the existing law and the legislative and administrative recognition of the deplorable conditions at the prison, the plaintiffs had little risk of not prevailing on some of the issues. The real controversies and uncertainties lay in litigating the remedy that the district court might impose. Thus, some measure of success on the merits was fairly certain, and no bonus for contingency appears warranted in this case.
 
 
 38
 Finally, the contingency factor should be assessed separately for the various stages of the litigation. Once a case has been won in the district court, the risk of nonrecovery diminishes greatly, even though there may be an appeal. In the instant case, recovery of some attorney's fees was certain after our appellate decision. A contingency bonus should not be given for hours expended in the district court after remand for work on the remedy or for time expended to establish the amount of the attorney's fee award.
 
 
 39
 No doubt in some unusual situation a factor we have not addressed in this opinion[10] will be considered by a district court to warrant adjustment of the fees awarded. We do not mean to preclude such an adjustment. We do require the court to identify the factor and articulate its reasons for including the factor in the fee award.
 
 D
 Law Clerks and Paralegals
 
 40
 We recognize the increasingly widespread custom of separately billing for the services of paralegals and law students who serve as clerks. The district court must determine whether law clerk and paralegal services are normally part of the office overhead in the area, and thus already reflected in the normal area billing rate the court has established in the case. If those services are not reflected in the area rate, the court may award them separately as part of the fee for legal services. The court should scrutinize the reported hours and the suggested rates in the same manner it scrutinizes lawyer time and rates.
 
 Other Expenses as Fees
 
 41
 Items that are normally itemized and billed in addition to the hourly rate should be included in fee allowances in civil rights cases if reasonable in amount. However, because there is no need to employ counsel from outside the area in most cases, we do not think travel expenses for such counsel between their offices and the city in which the litigation is conducted should be reimbursed. Departure from this rule should be made in unusual cases only. Thus, the district court properly disallowed travel costs to and from Denver for counsel based in Washington, D.C. The district court properly allowed reimbursement for the expense of travel between Denver and the Canon City prison, given its finding that such costs would normally be billed to a private client.
 
 
 42
 Although some firms separately itemize and bill long distance telephone charges, copying costs, and some other expenses, these kinds of expenses should be allowed as fees only if such expenses are usually charged separately in the area. In the instant case, we believe the district court properly found such costs are normally absorbed as part of the firms' overhead, and correctly refused reimbursement for photocopying, postage, telephone, books, and overtime secretarial work.
 
 
 43
 The district court reimbursed the plaintiffs for expert witness fees. Subsection 3 of 28 U.S.C. § 1920 allows fees to be awarded for "witnesses" and subsection 6 allows "[c]ompensation of court appointed experts." The law in this Circuit is clear, however, that expert witness fees are not allowed under § 1920, CleveRock Energy Corp. v. Trepel, 609 F.2d 1358, 1363 (10th Cir.1979), cert. denied, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980); Euler v. Waller, 295 F.2d 765, 766 (10th Cir.1961), and this appears to be the rule in the majority of jurisdictions that have decided the issue. See, e.g., Illinois v. Sangamo Construction Co., 657 F.2d 855, 865 (7th Cir.1981). However, out-of-pocket costs not normally absorbed as part of law firm overhead may be reimbursed under 42 U.S.C. § 1988:
 
 
 44
 "Some expenses are included in the concept of attorney's fees, as 'incidental and necessary expenses incurred in furnishing effective and competent representation,' and thus are authorized by section 1988.... The authority granted in section 1988 to award a 'reasonable attorney's fee' included the authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services."
 
 
 45
 Northcross v. Board of Education of Memphis City Schools, 611 F.2d 624, 639 (6th Cir.1979). Cf. Thornberry v. Delta Airlines, 676 F.2d 1240, 1244-45 (9th Cir.1982) (out-of-pocket expenses awardable in civil rights litigation); Fairley v. Patterson, 493 F.2d 598, 607 (5th Cir.1974) (same). The fees and costs of expert witnesses hired in a case are not normally absorbed as overhead in private firm litigation. Even if a firm advances such costs in a contingent fee case, reimbursement from the client's recovery in addition to the attorney's contingent fee is usually expected. Therefore, if the district court concludes that expert testimony was reasonably necessary, it may reimburse reasonable expert witness fees under § 1988. Accord Berry v. McLemore, 670 F.2d 30, 34 (5th Cir.1982); Roberts v. S.S. Kyriakoula D. Lemos, 651 F.2d 201, 206 (3d Cir.1981); Jones v. Diamond, 636 F.2d 1364, 1382 (5th Cir.), cert. dismissed, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981).[11]Costs
 
 
 46
 For items not reimbursable as attorney's fees under § 1988, the general costs statute, 28 U.S.C. § 1920, is controlling. Section 1920 allows certain costs to be taxed against the losing party, including "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case" and "[f]ees for exemplification and copies of papers necessarily obtained for use in the case." 28 U.S.C. § 1920(2), (4). Courts have generally held that the cost of taking and transcribing depositions fits within subsection 2. See Allen v. United States Steel Corp., 665 F.2d 689, 697 (5th Cir.1982); Sun Ship, Inc. v. Lehman, 655 F.2d 1311, 1318 n. 48 (D.C.Cir.1981); Economics Laboratory, Inc. v. Donnolo, 612 F.2d 405, 411 (9th Cir.1979); SCA Services, Inc. v. Lucky Stores, 599 F.2d 178, 181 (7th Cir.1979); Keyes v. School District No. 1, 439 F.Supp. 393, 417 (D.Colo.1977). When copies of the depositions are reasonably necessary to the litigation of the case, the costs of those copies are allowed pursuant to subsection 4. See Sun Ship, Inc. v. Lehman, 655 F.2d at 1318 n. 48; SCA Services, Inc. v. Lucky Stores, 599 F.2d at 181. The district court in this case found that the depositions taken and the copies made of those depositions were reasonably necessary to the prosecution of the action. We find no abuse of discretion in the taxing of those items as costs.
 
 III
 
 47
 We believe a remand is necessary in the instant case, even though the district court appears to have employed standards close to those articulated in this opinion in making its fee and cost determinations. In particular the court will have to reassess whether the plaintiffs obtained results warranting a fully compensatory fee in light of the standards set forth in Hensley v. Eckerhart. We are also unsure whether the district court's adjustment of hourly rates for "risk, overhead, delay and inflation," 539 F.Supp. at 747, approximates the award that would result under our direction to establish such rates by local standards as of the date the fee award is determined. The trial court's articulate and detailed opinion indicates it considered some of the concerns we have expressed with respect to total hours reported and their reasonableness, but we believe the court should again review the record in the light of the guidelines we have set forth above. Therefore, we REMAND for further proceedings consistent herewith.
 
 BARRETT, Circuit Judge, dissenting:
 
 48
 I agree with the majority that the case must be remanded for further proceedings and I commend the majority opinion for its analysis of the many factors, including those set forth in Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) and the twelve set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974), cited with approval in Battle v. Anderson, 614 F.2d 251 (10th Cir.1980), to be considered in the allowance of attorney's fees pursuant to 42 U.S.C. § 1988. The guidelines should prove helpful to trial judges. However, based on the particular facts of this case, I must respectfully dissent from the broad range of factors the majority would permit the trial court to consider upon remand. In this case, I would severely limit the factors to be considered by the district court in the allowance of reasonable attorney's fees.
 
 
 49
 The public interest was not served--in fact it was ill-served--and the Colorado taxpayers were abused by the trial court's award of attorney's fees in the amount of $709,933.50 and expenses in the amount of $32,782.43. The five week trial involved a parade of national prison system-facility experts and a full array of at least twelve lawyers representing Ramos who have claimed that their efforts required the expenditure of in excess of 9,000 hours in the public interest. In my view, this was unnecessary, uncalled for and contrary to the public interest, working to the detriment of the taxpayers of the State of Colorado. I shall relate my views and conclusion in some detail.
 
 Background
 
 50
 The Canon Correctional Facility, known as "Old Max", was originally constructed in the 19th century. Over the years additional buildings were constructed. There was little violence at Old Max until the late 1960's when more violent offenders began to enter the prison. Nationally, the situation was comparable. By the early 1970's the prison officials had largely lost control of penal facilities. Filth was prevalent and violence was commonplace.
 
 
 51
 On May 18, 1975, a riot occurred in cellhouse 1 of Old Max. It lasted about forty minutes. The inmates took control of the cellhouse, smashed the lights and killed one and injured 18. Governor Lamm immediately requested that an investigation be made and a report be submitted by the attorney general. The report recommended immediate legislative action.
 
 
 52
 By 1976, the Colorado General Assembly, working on a bipartisan basis with Governor Lamm, appropriated $989,610.00 for renovation and construction of the existing facility, and an additional sum of $671,127.00 for a new minimum security facility at Rifle, Colorado. Later in 1976, Governor Lamm called a special session of the general assembly. The legislature responded by appropriating $933,883.00 for renovation and construction and an additional $200,000.00 to plan a new facility. This resulted in a massive Touche-Ross Master Plan of 1977, which was later rejected and supplanted by a master plan proposed by the Department of Corrections and completed on or about February 24, 1978. In 1977, the legislature, again to improve conditions, appropriated $7,920,892.00 for planning and construction of a new medium security facility. Thus, in 1976 and 1977, the legislature appropriated over $22 million for the renovation of the existing facilities and the building of new facilities. The five year plan proposed by the Department of Corrections was adopted in 1978 by the general assembly and included new facilities and a comprehensive list of reforms to be implemented.
 
 
 53
 Colorado has moved consistently in its efforts to provide adequate correctional facilities. New facilities are now constructed and in use at a cost to the Colorado taxpayers well in excess of $22,500,000.00. The record shows that the State of Colorado, through its governor, general assembly and correctional officials, has in good faith grappled with the difficult problems, and at all times has proceeded with a specific remedial plan. The plan has been fully funded and implemented and has resulted in a substantial upgrading of Colorado's correctional system. Thus, since 1976, Colorado has attempted in good faith to remedy the antiquated facilities which are the subject of the complaint in this case.
 
 The Instant Litigation
 
 54
 On November 30, 1977, Fidel Ramos filed a pro se complaint against certain state defendants challenging as unconstitutional his status as a transitional worker at Old Max. He sought a job assignment. On January 16, 1978, the defendants filed a motion to dismiss Ramos's complaint. On February 15, 1978, the National Prison Project and the ACLU Foundation of Colorado appeared on behalf of Ramos and filed a 10 page amended complaint, styled as a class action, alleging that conditions of confinement at Old Max were unconstitutional. On March 23, 1978, the district court ordered seven other cases alleging constitutional violations at Old Max stayed pending the outcome of this case. On March 31, 1978, the district court certified this as a class action under Fed.R.Civ.P. 23(a). The class was certified as "all persons who are now or in the future may be incarcerated in the maximum security unit of the Colorado State Penitentiary at Canon City, Colorado."
 
 
 55
 On April 7, 1978, the State filed a motion to dismiss and/or abstain and stay proceedings. The trial court was made fully aware of the remedial steps then undertaken by the State of Colorado to renovate Old Max and to construct new, modern facilities and of the time table proposed for the completion of the projects. The State urged that extensive proceedings involving conditions at Old Max were, under the circumstances, unnecessary. Counsel for Ramos vigorously opposed the State's motion. The trial court denied the motion and ordered that the suit proceed without delay. The trial court and counsel for Ramos erred, in my view. The public interest would have been fully and adequately served if all proceedings had been limited exclusively to remedying only emergency matters at Old Max involving medical care, food, and safety, in light of the remedial steps then undertaken by the State. After extensive discovery held in 1978 and 1979, trial began on October 15, 1979. After five weeks of trial, the court on November 15, 1979, ruled in favor of plaintiffs and entered certain emergency orders pertaining to medical care. On December 20, 1979, the court filed a 75 page memorandum opinion and order. On December 28, 1979, appeal was taken from the judgment entered December 21, 1979.
 
 
 56
 At the date of the district court's order, the new facilities at Old Max and at Rifle were almost complete and the old facilities were to be closed and vacated within a matter of months.
 
 
 57
 Although the trial court's opinion did not expressly state the constitutional standard utilized to measure conditions at Old Max, it is clear from the ten factors enumerated in the opinion, (physical facilities, idleness, isolation, employment, education, recreation, personal safety, medical care, classification and access ) that the evaluation utilized the "totality of circumstances" standard to determine whether conditions gave rise to the possibility of mental, emotional or physical degeneration.
 
 
 58
 By the time the opinion of this court was entered, on appeal, Ramos v. Lamm, 639 F.2d 559 (10th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), almost all of the prisoners incarcerated at Old Max had been transferred to the newly constructed, modern maximum security facilities. For all practical purposes the district court's order had thus been rendered moot. The five week trial, venturing into every conceivable area and aspect of standards, personnel, practices and administration at Old Max, thus proved to be, in large measure, a wasteful venture. This is particularly so because, in my view, it is simply impermissible to transplant any findings of Eighth Amendment "cruel and unusual" violations found at Old Max to any other facility or place. If such was intended, I do not hesitate to say that such action constitutes an impermissible intrusion into the internal affairs of the State of Colorado involving its operation and control of the Colorado penal system.
 
 
 59
 The failure of the trial court and counsel for Ramos to give full recognition to the fact that renovation and construction of new penal facilities had actually been commenced by the State of Colorado two years prior to filing of the instant suit and had been expeditiously proceeded upon in all good faith by the State is inexcusable. This failure constituted a breach of the "delicate role assigned to the federal courts to display that restraint so necessary 'in the maintenance of proper federal-state relations'." Battle v. Anderson, 564 F.2d 388, 392 (10th Cir.1977) (quoting Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963)). As I reviewed the proceedings, I could not understand why the district court did not simply require emergency remedies at Old Max deemed necessary to protect the health and safety of the prisoners until the new facilities were open and Old Max could be left behind.
 
 
 60
 If the court was satisfied that the State was proceeding in good faith to cure the deficiencies requiring emergency attention, there was no need to spend five weeks venturing into defects and cures which, because of the new facilities, may never require the court's attention. Instead, the district court proceeded without regard for the new facilities under construction. It is my view that the district court should have stayed all proceedings except those involving emergency remedies required at Old Max. I cannot accept the proposition that it was necessary for the district court, the ACLU, the National Prison Projects and private counsel to push Colorado state officials to take action they had already determined to take. Federal courts must be reluctant to intervene in matters involving the administration, control and maintenance of state penal systems, in recognition of that restraint so necessary in the maintenance of proper federal-state relations. Battle v. Anderson, supra, 564 F.2d at 392. And federal courts must be ever mindful of an obligation to avoid needless conflict with administrative officials charged with the operation of penal facilities. The basic responsibility for the operation, control and management of penal institutions lies with the administrative officials and agencies charged therewith and it is not subject to judicial review unless exercised in such a manner as to constitute a clear abuse of discretion or caprice on the part of prison officials. Randle v. Romero, 610 F.2d 702 (10th Cir.1979); Marchesani v. McCune, 531 F.2d 459 (10th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 127, 50 L.Ed.2d 117 (1976); LeVier v. Woodson, 443 F.2d 360 (10th Cir.1971); Bethea v. Crouse, 417 F.2d 504 (10th Cir.1969).
 
 
 61
 That federal judges' individual views may be that a particular aspect of prison operation or administration is inept or undesirable does not compel the conclusion that the practice (or lack thereof) is necessarily constitutionally offensive. An Eighth Amendment cruel and unusual punishment challenge must be placed in proper context. That was definitively accomplished, in my view, in the case of Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The majority in Rhodes (Justice Powell was joined by Chief Justice Burger, and Justices Stewart, White and Rehnquist) held that conditions creating "cruel and unusual" punishment under the Eighth Amendment must meet the measure of one of three queries: (a) is the punishment "grossly disproportionate to the severity of the crime" warranting punishment; (b) do the conditions involve "the wanton and unnecessary infliction of pain"; or (c) do the conditions deprive "inmates of the minimal civilized measure of life's necessities." Id. at 347, 101 S.Ct. at 2399.
 
 
 62
 The majority in Rhodes observed that the record there did not evidence conditions proving that unnecessary or wanton pain was inflicted on the Ohio inmates or that the punishment was disproportionate to the crimes committed. Furthermore, the Court placed less weight on the opinions of experts and standards promulgated by correctional agencies than upon the public attitude. In dictum, this emphasis was explained. The Rhodes majority observed that harsh or restrictive conditions of confinement are part of the punishment criminal offenders justly receive; the Constitution does not mandate comfortable prisons. Justice Powell wrote that "[t]o the extent that such conditions [of confinement] are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id. at 347, 101 S.Ct. at 2399. Of particular import here, the Rhodes majority observed that state legislatures and state prison officials can properly weigh considerations affecting the adequacy of prisons because they are sensitive to the dictates of the Constitution, the problem of just punishment, the deterrence of future crime, and the promotion of rehabilitation. On this predicate, the Court cautioned lower federal courts to avoid overzealous design in granting relief to prisoners. The Rhodes opinion, in my view, is a clear signal that the federal judiciary should, absent inaction by state courts, legislatures and executive officials where dire circumstances exist in a state penal system, practice a hands-off policy.
 
 
 63
 There was nothing novel or challenging about the instant case. The State of Colorado had already recognized the infirmities in its penal system and was aggressively moving to remedy them. The majority opinion indicates that because the State of Colorado resisted the claims of unconstitutionality, a great deal of time and expense expended would have been saved if it had admitted to these conditions. What conditions and what specific requirements of change? The converse is that the State had moved the district court in the early pleading stages to abstain or stay the overall proceedings inasmuch as the State was in fact moving expeditiously to renovate or construct new maximum security facilities. However, the trial court and counsel for Ramos refused to compromise. There was no "give" on their part. Public interest lawyers cannot, under these circumstances, claim an "incentive" which simply results in the abuse of Colorado taxpayers.
 
 
 64
 In light of the circumstances, it was not proper for the trial court to review the gamut of conditions, standards, personnel, etc., at Old Max, well knowing that Colorado was moving forward to renovate and/or construct new, modern facilities. The taxpayers have been handed an unnecessary, unjustified bill. I would send this case back to the trial court with instructions to reduce the entire attorneys' fees allowance to that which would have been required only and exclusively in preparing and presenting evidence of those conditions at Old Max which required emergency attention while Colorado proceeded expeditiously to renovate and build the new penal facilities.
 
 
 65
 The district court should not have permitted national prison experts to appear and give prolonged testimony about national prison standards. In my view, Rhodes v. Chapman, supra, dictates otherwise. The clients' interest here involved only emergency conditions at Old Max and nothing more. There was no "genius" required of counsel for Ramos. It was unnecessary for the plaintiffs to utilize twelve attorneys to fight a battle which the State of Colorado had already declared won. It makes no sense to condemn state officers for not freely acknowledging all of the alleged unconstitutional conditions at Old Max under the "totality of circumstances" standard, particularly in light of Rhodes v. Chapman, supra. There was no policy to be vindicated by the plaintiffs. Before the suit was filed the decision had been made to expend millions of dollars to remedy the conditions existing at Old Max. It did not require novelty on the part of counsel for plaintiffs to face difficult questions under these circumstances. It did, however, constitute great waste of precious judicial time and tax dollars to litigate a case which was positively sure to become moot. It was in fact moot when this court rendered its opinion in 1980 in Ramos v. Lamm, supra.
 
 
 66
 Finally, the recent Supreme Court opinion in Hensley v. Eckerhart, supra, --- U.S. at ----, 103 S.Ct. at 1943, emphasizes that a crucial factor that district courts must consider in awarding attorney's fees under 42 U.S.C. § 1988 is the degree of success a plaintiff achieves. I recognize that in literal terms the plaintiffs here were successful in pursuing their claim for relief. If, however, as the Court in Hensley also instructed, the focus is placed on "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation", Hensley, supra, --- U.S. at ----, 103 S.Ct. at 1940, the plaintiffs' success here was far more limited. To the extent the State of Colorado had already made the commitment to remedy the conditions at Old Max, the overall relief obtained by Ramos was insignificant when compared to the hours expended on the litigation. The only significant relief obtained as a result of the litigation was the elimination of conditions at Old Max which directly and immediately affected the health and safety of the inmates. The award of attorney's fees should be considered in that light.
 
 
 67
 On remand, I would instruct the district court to undertake such further proceedings as are necessary to determine the award of attorneys' fees and the allowance of expenses, limiting the award to that portion of the prolonged trial proceedings which brought about necessary emergency relief at Old Max involving health and safety within the ambits of Rhodes v. Chapman, supra, prior to the removal of the inmates to the new penal facilities.
 
 
 68
 This matter comes on for consideration of defendants-appellants' and cross-appellees' petition for rehearing and amended petition for rehearing in the captioned causes.
 
 
 69
 Upon consideration whereof, the petition for rehearing and the amended petition for rehearing in these cases are denied. Judge Barrett would grant rehearing. We comment only on one point made by the trial judge in the June 30, 1983 scheduling conference, which he apparently intended to be brought to our attention. The judge questioned the burden our opinion places upon district judges to notify counsel in civil rights and other cases in which fees may be claimed from the losing party under federal statutes of counsel's duty to keep meticulous, contemporaneous time records. We reaffirm our directive. District Courts can meet that duty by adopting an appropriate local rule or by written notification from the court clerk's office at the outset of litigation in which a fee request appears to be a possibility. Either of these approaches seems better than directing that every potential litigant, many of whose counsel may be in federal court for the first time, will be deemed to have knowledge of this Court's opinion in this case.
 
 
 
 [1]
 The court below stated that most lawyers do not work on an hourly basis. This may be true for certain tasks, such as forming a small corporation, handling a simple divorce, or performing other often-repeated transactions for which the time commitment may be reasonably estimated and the lawyer may benefit by a flat fee arrangement. But when the matter is likely to require an extended and difficult-to-estimate time commitment and has an uncertain result, almost all lawyers will require an hourly fee, a share in the possible recovery, or a combination of the two. Thus, a fee award based on a calculation of hours expended is appropriate in civil rights cases
 
 
 [2]
 We recognize that in the instant case, and in other cases pending in this Circuit, some lawyers will not have kept contemporaneous time records. We do not forbid, retrospectively, the use of reconstructed time records and do not demand that the reconstructed hours be arbitrarily reduced. We impute no evil motive to lawyers who reconstruct their time records, but we believe that reconstructed records generally represent an overstatement or understatement of time actually expended. Even with the aid of pleadings, memoranda, and phone bills, lawyers often forget small increments of chargeable time such as telephone calls or short conferences with other counsel. On the other hand, lawyers who remember spending the entire day working on a case are likely to overstate the hours worked by forgetting interruptions and intrusions unrelated to the case. In the instant case, for example, Ms. Wiesenberg's reconstructed time records for May 3, 1980 to May 23, 1980 show the following hours of her time expended on the appeal: 10, 12.25, 14.05, 12.85, 13, 15, 5.5, 6.75, 20.75, 13.5, 9.65, 11.8, 13.05, 8.85, 14, 18, 0, 15.5, 11.85, 15.9, and 15.4. R. I, 172. We consider it doubtful that one lawyer, briefing an appeal, would work 20 days of a consecutive 21-day period, never spending less than 5.5 hours on the case and spending between 11.80 hours and 20.75 hours on 15 of those days. The district court should give special scrutiny to any reconstructions or estimates of time expended and make reductions when appropriate. See Hensley v. Eckerhart, --- U.S. at ----, 103 S.Ct. at 1939
 
 
 [3]
 Here again the experience of counsel in civil rights litigation may play a role. If the complexity of a case demands an extraordinary number of hours to perform a task, those hours are properly billable. If the inexperience of counsel requires the unusually large number of hours, the adversary should not be required to pay for more than the normal time the task should have required
 
 
 [4]
 However, we think that the presence of more than two lawyers during trial or the presence of more than one lawyer at depositions and hearings must be justified to the court. No fees should be awarded for hours reported by lawyers or law clerks who are present at depositions, hearings, or trial for the purpose of being trained and who do not participate in or contribute to the proceedings
 
 
 [5]
 We do not reject the possibility the normal local rate might be different for trial time and other time. See Palmigiano v. Garrahy, 466 F.Supp. 732, 741 (D.R.I.1979), aff'd, 616 F.2d 598 (1st Cir.), cert. denied, 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980)
 
 
 [6]
 While the district court will need evidence of local hourly rates, we agree with the court below that the practice of presenting experts to testify to the total fee that should be awarded in a given case is not very helpful. The trial court noted that the testimony of reputable lawyers as to the proper fee in the instant case differed by approximately $500,000
 
 
 [7]
 The Court expressly rejected the use of " 'a mathematical approach comparing the total number of issues in the case with those actually prevailed upon.' " --- U.S. at ----, 103 S.Ct. at 1940-41. We note that a mathematical approach ignores many relevant factors, including the relative importance of the issues
 
 
 [8]
 That case states:
 "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."
 --- U.S. at ----, 103 S.Ct. at 1940.
 
 
 [9]
 We express no opinion as to the limiting effect of a contingent fee arrangement on the total award that may be made for attorney's fees in a civil rights case. That matter is under consideration by this Court after en banc argument. Cooper v. Singer, Nos. 81-2016, 81-2113 (10th Cir. argued May 19, 1983)
 
 
 [10]
 Most of the factors listed in Johnson v. Georgia Highway Express, Inc., including time and labor expended, novelty and difficulty of the questions, attorney skills required, the customary fee, contingency factors, undesirability of the case, and the experience and ability of the attorneys, are considered in making the determinations we have set forth above. We comment here on the remaining Johnson factors. Time constraints imposed upon counsel will seldom be a factor in a civil rights case, at least one involving hundreds of hours of attorney time. We do not see why the length of the professional relationship with the client should have anything to do with the appropriate fee in these kinds of cases. The time committed to an extended civil rights case will of course preclude the expenditure of that time for other remunerative work, but this fact alone should not require an adjustment because the time is being compensated at a reasonable rate
 
 
 [11]
 The defendants rely upon Roadway Express, Inc. v. Piper, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), in urging the contrary rule, but we do not find that case to be controlling. There the Court held that § 1983 and 28 U.S.C. § 1927 could not be read together to tax attorney's fees in addition to costs against an attorney. Section 1927 at that time allowed costs to be awarded against an attorney who unreasonably multiplied the proceedings and was subsequently amended to allow attorney's fees as well as costs to be awarded in those situations. Neither the Court's reasoning nor its holding dealt with whether costs not expressly provided under § 1920 could be awarded pursuant to § 1988