Sullivan
No. 84-022

JOHN E. TERZIS

v.

ESTATE OF WILLIAM J. WHALEN,
JOAN KELLEY, ADMINISTRATRIX, & a.

February 15, 1985

*Law Offices of Charles V. Spanos,* of Claremont (*Charles V. Spanos* on the brief and orally), for the plaintiff.

*Leahy, Denault & Moody,* of Claremont (*Thomas P. Connair* on the brief, and *Albert D. Leahy, Jr.,* orally), for the defendants.

BROCK, J.   The plaintiff, a Connecticut attorney, filed a bill in equity against the estate of a former client, seeking to foreclose a $25,000 mortgage securing a fee arrangement. The defendants are the estate, the administratrix, and the decedent's heirs, William J. Whalen, III, and Jeannie Whalen. The mortgaged real estate is in New Hampshire, but the mortgage was drafted on a Connecticut form which did not include a power of sale. The Master (*Charles T. Gallagher,* Esq.), whose report was approved by the Superior Court (*Johnson,* J.), ruled that the fee arrangement was valid and allowed reformation of the mortgage to include the power of sale, thus permitting the plaintiff to foreclose and collect up to $25,000 in attorney's fees. For the reasons that follow, we reverse and remand.

The evidence presented at trial established the following facts. The decedent, William Whalen, was first introduced to the plaintiff in 1975, and the plaintiff represented him in several minor matters beginning in 1977. In connection with one of these matters, attorney Terzis once asked Mr. Whalen to pay him a fee of $2,500, but no money was ever paid. Until 1979, both the plaintiff and Mr. Whalen understood that the plaintiff's fee for all legal work was $100 per hour.

In January, 1979, Mr. Whalen asked the plaintiff to defend him in criminal and civil proceedings which he expected to be brought against him by the State of Connecticut and his former employer. These proceedings involved Mr. Whalen's alleged misuse of company credit cards, telephone and expense accounts, both during his employment as a salesman and after his termination in June 1977. The plaintiff agreed to represent him and testified that he and two paralegals in his office began, shortly thereafter, to analyze the contents of several large boxes of documents which Mr. Whalen delivered to him.

The fee arrangement at issue in this case involved services rendered by attorney Terzis between the date the boxes were delivered —sometime in January or early February 1979, according to the plaintiff—and October 26, 1980, the date of Mr. Whalen's death. Other than documents relating to the fee arrangement, there was nothing in the plaintiff's file on Mr. Whalen. Thus, the only affirmative evidence concerning the nature and extent of the services rendered by the plaintiff was his own testimony before the master.

That testimony, although often vague and sometimes contradictory, was that the plaintiff and two paralegals spent some 1200 hours working on Mr. Whalen's case during the period in question. The plaintiff further testified that most of this time was spent in analyzing the credit card and expense account records provided by Mr. Whalen, in order to establish the "flow of transactions" through which Mr. Whalen was supposed to have profited illegally.

Under cross-examination, attorney Terzis stated that, while analyzing these documents, he had made notes which he then discarded because he did not need them. He also testified, without explanation, that he did not need to keep records of the time spent on the case, despite the fact that Mr. Whalen had agreed to pay him by the hour.

By July 1979, the plaintiff had completed most of his document analysis, but had never been paid any money by Mr. Whalen. At that time, he drafted an agreement calling for Mr. Whalen to pay him a nonrefundable retainer of $15,000, which would "cover all professional services up to the day before trial on any of the criminal and civil suits" with which Mr. Whalen was threatened. The plaintiff and Mr. Whalen signed the agreement, but no money was paid.

In June 1980, Mr. Whalen came to the plaintiff requesting further assistance, saying that he had just received a subpoena from the postal authorities and a letter from a bonding company, demanding that he discuss the credit card and expense account charges. The plaintiff refused to represent Mr. Whalen further until he paid the retainer. Mr. Whalen then said that he had no money, but would give the plaintiff a $25,000 note secured by a second mortgage on his vacation home in New Hampshire.

Attorney Terzis prepared the note and mortgage on a Connecticut form, and amended the 1979 retainer agreement to reflect the new arrangement. Mr. Whalen signed all the documents, and the plaintiff continued to work on the case. The plaintiff testified that he demanded payment on the note in August, 1980, but at about the same time Mr. Whalen was admitted to a hospital, where he died intestate on October 26, 1980, never having paid the plaintiff any money.

Upon learning that the mortgage was not legally enforceable in New Hampshire without a power of sale provision, attorney Terzis brought this equitable action against Mr. Whalen's estate and heirs, seeking reformation of the mortgage and subsequent foreclosure. In their amended answer, the defendants stated that the note secured by the mortgage was without consideration. They also called on the plaintiff to "do equity and disclose fully the basis for his request . . . ."

At trial the plaintiff presented only his own testimony and that of another Connecticut attorney. The latter testified that in his opinion both of the plaintiff's retainer agreements involved fees that were fair and reasonable, based on the type of case involved and the amount of time that the plaintiff claimed to have spent on it.

At the close of the plaintiff's case, the defendants moved for dismissal of the action, arguing that the plaintiff had failed to meet his burden of proving the reasonableness of the fee arrangements, and that he had also failed to show consideration for the increase in Mr. Whalen's obligation from $15,000 to $25,000. The court denied the motion and subsequently ordered reformation of the mortgage. The court refused to enforce a provision of the note that would have permitted the plaintiff to recover attorney's fees incurred in this action. That ruling was not appealed and is not at issue here.

■ We will affirm a master's findings and rulings "unless they are unsupported by the evidence or are erroneous as a matter of law." *Stanley D. v. Deborah D.*, 124 N.H. 138, 143, 467 A.2d 249, 251 (1983).

■ The master in this case noted, when denying the defendants' motion to dismiss, that there are few precedents in this State dealing with attorney-client fee arrangements of the sort involved here. In his final report, he applied the predominant rule in this country: that "a fee contract made during the existence of an attorney-client relationship is valid and enforceable if it is fair and equitable and was freely and voluntarily executed with full understanding by the client." 7 AM. JUR. 2d *Attorneys at Law* § 249 (1980).

In applying this standard, the master impliedly accepted the plaintiff's testimony as to the extent of the legal services he had performed for Mr. Whalen. His report concludes that

> "the $15,000 payment was a very fair estimate of the value of legal services rendered to Mr. Whalen and to be rendered up to the date of the anticipated trials. The mortgage amount of $25,000 is justified by the lapse of time after the first agreement, the fact that payment was to be delayed, that the mortgage was a second mortgage and that the property mortgaged was at a distance . . . .

Mr. Whalen recognized the essential fairness of these terms by suggesting the arrangement and by executing the note, the mortgage and the addendum to the retainer agreement."

■ Although the rule relied upon by the master was appropriate, we hold that the policy considerations underlying the rule demand stricter scrutiny in its application than was achieved in this case. Those considerations have been aptly summarized by the United States Court of Appeals for the District of Columbia Circuit:

"Fee contracts between attorney and client are a subject of special interest and concern to the courts. They are not to be enforced upon the same basis as ordinary commercial contracts. Especially is this true where, as in this case, a contract beneficial to the attorney is executed long after the attorney-client relationship has commenced, when the position of trust is well established, and the litigation involved is reaching its culmination . . . . Many courts . . . have gone so far as to say that [such contracts] are attended by a presumption of invalidity and overreaching. They are always subject to the close scrutiny of the court whenever judicial enforcement is sought. 'The rule is founded in public policy, and operates independently of any ingredient of actual fraud or of the age or capacity of the client, being intended as a protection to the client against the strong influence to which the confidential relation naturally gives rise.'"

*Spilker v. Hankin*, 188 F.2d 35, 39 (D.C. Cir. 1951) (footnote omitted) (quoting *Thomas v. Turner's Adm'r. & al.*, 87 Va. 1, 12, 12 S.E. 149, 153 (1890)). Accordingly, any attorney seeking to enforce a contract of this kind has the burden of proving that it is fair and reasonable, and that the client had full knowledge "of the facts and of his legal rights with relation thereto." *Lady v. Worthingham*, 57 Cal. App. 2d 557, 560, 135 P.2d 205, 207 (1943); *Rock v. Ballou*, 286 N.C. 99, 104, 209 S.E.2d 476, 478 (1974).

Although this case did not involve actual litigation, as *Spilker* did, the distinction is not crucial. Mr. Whalen was clearly the subject of an investigation dealing with a large number of transactions, his relationship with attorney Terzis was well established, and when he signed the documents at issue here, he was faced with what might easily be called a crisis. He had received two official documents demanding an explanation of his activities, and his lawyer threatened to withdraw from the case without some assurance that his fee would be paid.

■ "[W]here an attorney, with the work he is required to do under his contract partially performed, exacts from his client an additional compensation under a threat of withdrawing from the case if the agreement was not made, nothing but the best of reasons would be sufficient to uphold the agreement." *Moore v. Rochester W. M. Co.*, 42 Nev. 164, 177, 174 P. 1017, 1021 (1918).

■ In this case, there was no evidentiary support for the master's finding that the change in the amount of the retainer from $15,000 to $25,000 was justified. There was nothing to indicate that the lapse of time, the existence of an earlier mortgage, and the remoteness of the mortgaged property combined to make the agreement secured by the mortgage and note effectively equivalent to the earlier unsecured retainer agreement. Nor did the plaintiff offer any evidence that he was required to do substantially more work than Mr. Whalen had led him to believe was necessary; *i.e.*, there was no indication that additional consideration was given for the increased fee.

Because the revised agreement, secured by the note and mortgage, on its face provided for additional compensation over and above that provided by the original agreement, the plaintiff could not possibly be found to have sustained his burden of proving that the revised agreement was fair and equitable, under the rules outlined above.

■ Similarly, there was little or no evidence that Mr. Whalen signed either the retainer agreement or the mortgage with full knowledge of "the facts and of his legal rights." When we add to this the total absence of contemporaneous time records or documentary evidence supporting the plaintiff's claims regarding the amount of time he worked on Mr. Whalen's case, we are compelled to conclude that the master erred in ruling that the $25,000 fee agreement was valid.

■ At least four federal appellate courts have ruled that, "in cases involving fee applications for services rendered . . . , the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952 (1st Cir. 1984); *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983); *New York Ass'n for Retarded Child. v. Carey*, 711 F.2d 1136, 1148 (2nd Cir. 1983); *Nat. Ass'n of Concerned Vets. v. Sec. of Defense*, 675 F.2d 1319, 1327 (D.C. Cir. 1982); *accord Mercy Hosp., Inc. v. Johnson*, 431 So. 2d 687, 688–89 (Fla. Dist. Ct. App. 1983). A similar standard should apply here, where

an attorney seeks equitable reformation of a mortgage securing a fee arrangement entered into under threat of withdrawal from an established attorney-client relationship.

The court in *Spilker v. Hankin*, 188 F.2d at 39, held that the policies demanding close scrutiny of attorney-client contracts were strong enough to override the doctrine of res judicata. Those same policies are strong enough to defeat the plaintiff's contention that the defendants failed to raise the issue of fairness in a timely fashion.

Even though the defendants did not specifically refer to the question of fairness in their pleadings, their defense of lack of consideration gave the plaintiff sufficient notice of the issue to prevent unfair surprise. More importantly, the defendants are not the only parties with an interest here. "Courts have a stake in attorney's fees contracts; the fairness of the terms reflects directly on the court and its bar." *Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982).

■ Accordingly, we may consider the fairness issue even where, in a different type of case, it might have been precluded from consideration because it was not specifically raised in the pleadings below. The master implicitly recognized as much when he ruled on the fairness issue.

Although we conclude that the plaintiff's claim for legal services rendered to the defendant's intestate cannot exceed, nor even approximate on the record before us, the sum of $15,000, we find that equity requires that the case be remanded for a new trial so that the plaintiff may prove the value of those services in accordance with the standards we have set forth in this opinion.

*Reversed and remanded.*

DOUGLAS, J., concurred specially; the others concurred.

DOUGLAS, J., concurring specially: An attorney's file that contains nothing but a letter, a note and a mortgage, yet supposedly represents hundreds of hours of work, is clearly an outrageous sham. Without detailed contemporaneous time records, I cannot see justification for *any* fee in this case.