No. 73,288

SHEILA A. and THOMAS A., by their next friends, J. EUGENE BALLOUN and SHEILA WOMBLES, *et al.*, *Appellants*, v. DONNA WHITEMAN, in her official capacity as Secretary of Social and Rehabilitation Services, *Appellee.*

(913 P.2d 181)

Opinion filed March 15, 1996.

*Jerry R. Palmer* of Palmer & Lowry, of Topeka, and *David J. Waxse*, of Shook, Hardy, & Bacon, P.C., of Overland Park, argued the cause and were on the brief for appellants.

*Michael George*, chief of litigation, Kansas Department of Social and Rehabilitation Services, argued the cause, and *Reid Stacey*, of the same agency, *Deborah Purce-Jones*, of Jones and Jones, of Topeka, and *Donald A. Frigon*, of Frigon Law Firm, of Topeka, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is an appeal from the amount of attorney fees awarded under 42 U.S.C. § 1988 (1988) by the trial court to the prevailing parties in a class action suit resulting in a favorable settlement where widespread statutory and constitutional violations of the Kansas child welfare system were alleged.

Although the four issues raised by this appeal involve only the amount of attorney fees and expenses allowed to the prevailing parties after a settlement occurred subsequent to 4½ years of bitterly contested and contentious pretrial proceedings, a fairly comprehensive history of the litigation is essential to an understanding of the trial court's decision and our opinion herein.

In January 1989, Rene Netherton, a Topeka attorney and guardian ad litem, sued the Secretary of the Kansas Department of Social and Rehabilitation Services (SRS) on behalf of eight minor plaintiffs then in the care, custody, and control of SRS. The suit requested class action status, alleged SRS failed to provide the least restrictive environment necessary to meet the needs of the children, failed to promptly remove children from abusive or dangerous homes because of a lack of adequate placement facilities, failed to provide adequate social worker staffing, and failed to provide statutorily required reports to the court. The suit further alleged that because of the policies and procedures formulated by SRS, the children were being returned to an abusive home environment, not provided treatment for severe mental disorders, and not provided with a regional runaway center.

The plaintiffs' claim was that the "[d]efendants' failure to provide appropriate placements for Plaintiffs and to meet the emotional and psychiatric needs of the Plaintiffs violates the Plaintiffs' constitutional rights to appropriate treatment in violation of 42 U.S.C. § 1983, The United States Constitution and the Bill of Rights of the State of Kansas."

The defendants responded with a motion to dismiss. In March 1989, the plaintiffs amended their petition, adding detailed factual allegations regarding the experiences of each plaintiff with SRS custody and asserting as legal theories (1) violation of the plaintiffs' Fourteenth Amendment rights not to be deprived of state and federally created benefits, property, and liberty interests without due process; (2) the plaintiffs' rights to "liberty, privacy and family integrity in violation of the First, Eighth, Ninth and Fourteenth Amendments"; (3) the plaintiffs' Fourteenth Amendment rights to placement in the least restrictive setting; and (4) the plaintiffs' rights "pursuant to the Adoption Assistance and Child Welfare Act,

P.L. 96-272, 42 U.S.C. sec. 670, *et seq.*, and the state plan pursuant thereto, to preventive and protective services, to child welfare services, to case planning, to periodic review, to reunification and adoption services, [and] to placement in the most appropriate setting."

The defendants again responded with a motion to dismiss, which precipitated a flurry of responses and replies by both sides. In July 1989, the trial court denied the defendants' motion to dismiss, finding the petition stated a claim for relief under 42 U.S.C. § 1983 (1988).

In September 1989, after attempting to obtain additional counsel in Northeast Kansas and Wichita, attorney Netherton convinced Christopher Hansen and Christopher Dunn of the American Civil Liberties Union Children's Rights Project in New York to enter appearances as co-counsel for the plaintiffs. In December 1989, Marcia Robinson Lowry, also of the Children's Rights Project, entered her appearance on the plaintiffs' behalf.

In February 1990, the plaintiffs filed a motion for class action certification, which was opposed by the defendants. In March 1990, the plaintiffs filed an additional amended petition, significantly expanding both the factual details and the legal claims.

This amended petition named the Governor of Kansas, Secretary of SRS, Commissioner of Youth Services, Director of the Kansas Child in Need of Care (CINC) program, and SRS. The petition was brought on behalf of children who have been in CINC custody or are at risk of being placed therein and alleged violations of (1) the plaintiffs' federal and Kansas constitutional rights, (2) the plaintiffs' rights under the federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620-627, 670-679 (1994), (3) the plaintiffs' rights under the federal Child Abuse Prevention and Treatment Act, 42 U.S.C. §§ 5101 *et seq.* (1988), and (4) the plaintiffs' rights under the Kansas Code for Care of Children, K.S.A. 38-1501 *et seq.*

The petition alleged systematic failures to (1) timely and adequately protect children (failing to timely and adequately investigate and respond to reported abuse and neglect); (2) appropriately place children in SRS custody (failure to remove from homes, overly restrictive placements, inadequately restrictive placements,

overcrowded foster homes, inappropriate use of juvenile detention facilities, etc.); (3) provide adequate case plans for children in SRS custody (no case plans, substandard case plans, inadequate efforts to reintegrate children with families, inadequate services to resolve problems, failure to facilitate adoptions); (4) provide proper care for children for whom SRS is responsible (missed doctor appointments, lack of medical records); (5) provide federally mandated dispositional hearings; (6) provide adequately trained staff (too few social workers, poor or no training); and (7) have an information system to record data on children in foster care.

In short, the amended petition attacked nearly every phase of the Kansas child welfare system. Yet, it did so in the limited context of asserting claims for violations of two specific federal statutes, plus the Kansas Code for Care of Children and the Fourteenth Amendment.

In August 1990, the trial court issued a memorandum decision on the defendants' motions to dismiss some or all of the plaintiffs' claims. The trial court dismissed SRS from the suit, leaving its Secretary as a party, but otherwise denied the defendants' requested relief. In September 1990, the trial court certified the proceeding as a class action.

As part of the discovery process, the parties conducted case readings, whereby experts reviewed the files of a representative sample of children in SRS custody to gather statistical information from SRS's records. Both parties retained experts for this purpose.

In October 1992, in response to the election of a new governor, new public officers were substituted for those originally named as defendants. In March 1992, a different judge was assigned the case.

In June 1992, the defendants moved to dismiss or in the alternative for summary judgment. The motion was principally addressed to the effect of the recent United States Supreme Court case of *Suter v. Artist M.*, 503 U.S. 347, 118 L. Ed. 2d 1, 112 S. Ct. 1360 (1992), on the pending action. The *Suter* decision reversed *Artist M. v. Johnson*, 917 F.2d 980 (7th Cir. 1990), which had affirmed the federal district court. See 726 F. Supp. 690 (N.D. Ill. 1989). *Suter* held that a provision of the federal Adoption Assistance and Child Welfare Act, similar to the provision alleged in

this case to have been violated, did not provide a private right of action enforceable through 42 U.S.C. § 1983. The defendants further argued the reasoning of the *Suter* case also applied to the Federal Child Abuse Prevention and Treatment Act, which the plaintiffs also relied on.

In August 1992, the trial court dismissed the then Governor of Kansas from the action after finding there was no remedy obtainable against her. This ruling was appealed to our court and was the subject of *Sheila A. v. Finney,* 253 Kan. 793, 861 P.2d 120 (1993), wherein we summarily held that since at the time of argument a settlement agreement with the remaining defendant (SRS) had disposed of all matters in controversy, the appeal was moot.

In October 1992, the trial court ruled that based on *Suter,* the statutory claims under the Adoption Assistance and Child Welfare Act of 1980 and the Child Abuse Prevention and Treatment Act were dismissed. The court further determined that the plaintiffs' constitutional claims remained in that the involuntary placement of a child into foster care by SRS invokes the Due Process Clause of the Fourteenth Amendment. The nature and extent of that due process right was elucidated.

The court noted that children in foster care are entitled to basic physical needs of food, clothing, shelter, and medical care. The court explained that the level of care that is constitutionally adequate depends on the characteristics of each individual and may vary from person to person. As representatives of a class, the petitioners were not entitled to litigate the constitutional adequacy of the care given to individual class members with special needs, but only those common to the class, and thus the focus would be on the minimum constitutional standards required of the child welfare system. Neither ordinary nor gross negligence would be relevant to constitutional deficiencies, only systemic problems.

The court further ruled the minimal constitutional adequacy of the level of foster care would be that generally recognized and accepted in the field of foster care by qualified professionals. The court summarized: "[T]he elements which must be proven to establish a violation of a foster child's constitutional rights are state action which exposes a child to known danger *or* a substantial de-

parture from generally recognized professional standards or professional judgment *and* that such action is the proximate cause of demonstrable injury." The court then held:

"[T]here is no inherent constitutional right of a child in foster care to a normal childhood, sibling visitation, case planning, reunification plan, stable placement, adequate social workers, or placement in the least restrictive environment. These programs are desirable goals of good foster care. But, whether or not the children in foster care in· Kansas are being unreasonably and unnecessarily harmed as a class, by the policies or operations of SRS in a demonstrable way, is a matter of fact. The absence or mismanagement of these kinds of programs may be part of the plaintiff's proof to show exposure to known danger or substantial departure from professional standards or judgment, but they are not established constitutional rights."

The trial court further ruled that the plaintiffs' 42 U.S.C. § 1983 action could only be based on their constitutional claim and not on their claims arising under state law.

In March 1993, the trial court ruled on another motion by the defendants for summary judgment, dismissing any remaining claims based on deprivation of food, shelter, clothing, medical treatment for physical injury or illness, or placement in a foster home in which there is a known danger. It ruled the constitutional claim could not be summarily dismissed. It held that while none of the plaintiffs' allegations regarding case management, placement, permanency planning, foster parent and child supervision, counseling and medical services, visitation, or adoption services established Fourteenth Amendment violations taken individually, collectively they might support a conclusion that the Kansas foster care system as a whole substantially departs from generally accepted standards for child welfare.

The court noted the record contained no expert opinion linking emotional and developmental harms of the plaintiff children to the foster care system with any degree of medical certainty. However, the court found that testimony from the plaintiffs' experts was sufficient to preclude summary judgment; those experts believed research would bear out the requisite causal link. The court denied the defendants' motion to decertify the class.

In March 1993, the trial court ordered the parties to enter into mediation before retired Judge Michael Barbara in an attempt to resolve the remaining issues and reach a settlement. Mediation began, and by the end of March, the parties resolved all major issues in a settlement approved by the court. SRS Secretary Donna Whiteman remained as the sole defendant in this case.

The parties' settlement agreement contained substantive terms relating to protective services, preventive services, case planning and reviews, placements, services, adoption, staffing, staff training, the implementation of an information system, and a program to monitor compliance. The parties acknowledged the agreement came about as a result of their mediation and would result in the dismissal of the pending action without prejudice. The agreement recited that it confirmed the goals of SRS as expressed in its family agenda policy manual. Many of the provisions of the agreement simply expressly commit SRS to compliance with the provisions of its policy manual.

Each phase of this litigation continued to be bitterly and contentiously contested. The filings of the parties in the trial court up to this point reached nearly 7,000 pages.

In April 1994, the plaintiffs filed a motion seeking attorney fees and expenses pursuant to 42 U.S.C. § 1988. The motion requested, *inter alia*, fees for ACLU attorney Christopher Dunn of $583,925 based on a billing rate of $250 per hour; fees for ACLU attorney Christopher Hansen of $673,410 based on a billing rate of $300 per hour; fees for ACLU attorney Marcia Robinson Lowry of $61,075 based on a billing rate of $350 per hour; fees for Topeka attorney Rene Netherton of $119,430 based on a billing rate of $100 per hour; and fees for Kansas City attorney David Waxse of $21,114 based on a billing rate of $175 per hour. Reimbursement of costs and expenses was also requested.

The defendant opposed the plaintiffs' motion for fees and asserted a fee claim of her own. The defendants argued that the plaintiffs were not the prevailing party and were not substantially successful; the fees requested were unreasonable because much of the billed time related to unsuccessful, dismissed claims or dis-

missed defendants; and any fees which might be allowed should be at local, not New York, rates.

In partial response, the plaintiffs submitted an affidavit of Rene Netherton, the attorney who began the litigation. Netherton stated that after working on this case for 5 months, she realized she had neither the expertise nor the resources to successfully litigate the case. She contacted other attorneys and organizations in an attempt to find experienced local co-counsel. She discussed the case with Kansas Legal Services; Marla Luckert of Goodell, Stratton, Edmonds, Palmer, and Wright; Jerry Levy; and Jerold E. Berger; the Washburn Legal Clinic and various Washburn professors; Elizabeth Herbert of Irigonegaray & Associates in Topeka; and Mark Hutton of Michaud, Hutton, Fisher, and Anderson, in Wichita. None of these parties were willing to act as co-counsel, citing such reasons as a lack of expertise, a lack of resources, or conflicts. Eventually, Netherton contacted the Children's Rights Project of the American Civil Liberties Union in New York, which after investigation agreed to become involved in the case.

The defendant responded to the plaintiffs' fee request by arguing that the changes wrought in the foster care program were the result of factors other than the lawsuit. The defendant traced the history of legislative oversight of SRS foster care programs through the legislative division of post audit. A 1987 performance audit report identified a lack of appropriate placement resources. SRS argued the expansion of the foster care program memorialized in the settlement agreement resulted from this critique of placement resources. Another performance audit report in October 1990, "Kansas' Foster Care Program, Part I: An Overview of the Program" criticized the accuracy of the information in SRS tracking system, the rate of multiple placements, the caseload of social workers, and the training provided for foster parents. The defendant argues that as a result of this report, the 1992 legislature significantly increased staffing and provided funding for an automated child tracking system.

The November 1990 performance audit "Assessing How Effectively the Department of Social and Rehabilitation Services Handles Reports of Child Abuse and Neglect" addressed the need for

training Child Protective Services staff, the need for supervision and documentation of their decisions, and the need to clarify or revise their procedures and policies. This report provided the impetus for SRS's family agenda policy manual, which clarified and revised investigatory and supervisory procedures, and new training programs for social workers.

Further post audit reports in March 1991, April 1991, and June 1991 dealt with issues of information management, monitoring and supervision, staffing and funding levels, and expanded prevention services. The result of the post audit reports, the defendant argues, was increased funding by the Kansas Legislature in 1992. The defendant provided the trial court with documentation of the recommendations of the performance audit reports and the initiatives implemented in response thereto.

The defendant further submitted evidence regarding the prevailing local rate of attorney fees and the availability of local counsel to assist in complex class action litigation. As were the other aspects of the lawsuit, the attorney fees issues were hotly contested, with both sides submitting multiple written arguments and significant supporting documentation.

In November 1994, the trial court issued its order on attorney fees from which this appeal is taken. In the 16-page order, the trial court dealt with the issues raised by the parties in considerable detail. The trial court recounted a brief history of the case. It noted that as the case progressed, the viable claims of the plaintiffs steadily decreased until, at the time of trial, they were about at the same point in terms of parties and claims as when attorney Netherton filed the original petition. Since fees under 42 U.S.C. § 1988 are appropriate only when the plaintiff vindicates federal constitutional or statutory rights, and not rights secured by state law, the trial court noted that the only constitutional claim remaining at the time of settlement was that the foster care system as a whole fell below constitutional minimums—a claim the court noted would be difficult to prove. The court found the state claim, that SRS operated the foster care system in violation of state laws and guidelines, to be the plaintiffs' strongest claim. Consistent with these findings,

the court held: "The causal connection between this lawsuit and the settlement agreement are the claims based upon state law."

The trial court also noted the similarity of the settlement agreement to the post audit reports and the role of the legislature's own review in bringing about the changes memorialized in the settlement agreement. The court stated: "It is impossible to differentiate whether the legislature was motivated more by its own Post Audit reports, the attitude of the legislative leadership at the time, or this litigation."

Nevertheless, the court determined the children of Kansas were benefitted by the settlement of the case in that SRS became bound to follow its own rules, regulations, and standards in the future, preventing "downward drift" in the foster care program. Insofar as the settlement provided this benefit, the trial court found the plaintiffs obtained some of the relief sought.

The court specifically held that *"[t]he filing of this lawsuit brought positive changes and improvements in the foster care system which probably would not have occurred absent this litigation."* (Emphasis added.)

The court went on to hold:

"In settlement of a lawsuit, it is usually the case that the discovery, preparation and other work done in connection with preparation for trial contributes to the settlement. The Court is not convinced that the lawyers' efforts which preceded the settlement added much here. The legal position of S.R.S. was stronger at the time of pre-trial than ever before, certainly as to the U.S. Constitutional claims. The deficiencies in the foster care system had been described by the legislative post auditor. Not much illumination was added on the problem by all that preceded the court-imposed settlement process."

Nevertheless, the trial court made the following specific finding which was not appealed by the defendant:

"At the time the settlement process began the State remained threatened by a viable constitutional claim in this case. As a result of the settlement of the lawsuit it is reasonably assured the State will continue to keep its foster care programs above standard. For these two reasons, it is my conclusion that plaintiffs should be considered to be sufficiently successful that they should be compensated by the State for their attorneys' fees that are directly attributable to achieving the settlement of this case."

The court then turned to the question of quantifying the attorney fees. The court determined the billings by Kansas attorneys Waxse and Netherton were reasonable and that their involvement was important to the settlement of the case. It then considered the fees due for the ACLU counsel and stated:

"[T]he statement submitted by counsel for the Children's Rights Project is more problematic. It includes travel time between New York and Topeka; work on an interlocutory appeal taken in this case, which they lost; work on legislative issues unrelated to this case and time spent with the press. Also, plaintiffs' statements include a substantial number of intra-office conferences where counsel conferred with one another, A.C.L.U. staff and other advisors, and conferences which give insufficient details of what was occurring. Although communications between co-counsel, staff and advisors may be necessary, when there are dual billings for essentially the same work product or for what amounts to training, supervision or policy direction from organizational leadership, an opposing party should not be requested to pay. The Court has disallowed fees requested by Marcia Robinson Lowery for these reasons and reduced the requests for Mr. Hansen and Mr. Dunn accordingly.

"Some of the entries in plaintiffs' itemized fee requests are vague, ambiguous or incomplete, thereby making it impossible for the Court to determine what specific task was billed or what relevance it had to settlement of this case. When the explanation is inadequate, the Court has resolved the question against the plaintiffs. [Citations omitted.] . . . .

"The court is not required, nor will it undertake to identify and justify every specific hour disallowed for impermissible vagueness and ambiguity. [Citation omitted.]. Rather this Court shall, based upon its complete review of the records submitted, and upon its experience and judgment, reduce the number of hours claimed to allow compensation only for those hours which the Court can find were directly contributed to the settlement of this case."

The court reduced Dunn's hours by 35 percent and allowed billing at the Topeka rate of $100 per hour. Hansen's hours were reduced from 428.5 to 215 to be billed at the Topeka, Kansas City, and Wichita rate of $175 per hour. The rates were based on the court's conclusion that there were experienced, capable attorneys available locally for the type of work that was billed. The court also denied the defendant's claim for fees and the plaintiffs' claim for expenses.

Plaintiffs appeal from the order awarding attorney fees and expenses, contending (1) the trial court erred as a matter of law in denying the plaintiffs fees for all work that preceded the settlement

negotiations, (2) the trial court erred as a matter of law in denying the plaintiffs reimbursement for all expenses, (3) the trial court erred as a matter of law in denying the plaintiffs appropriate rates for the work of lead counsel, and (4) the trial court erred when it reduced the reimbursable hours of the plaintiffs' lead counsel in a discriminatory and arbitrary manner.

We affirm in part and reverse in part.

*Did the trial court err in denying attorney fees for all the work that preceded the settlement negotiations?*

The plaintiffs argue that our standard of review is de novo over whether a given category of attorney time is reimbursable under the Civil Rights Attorney's Fees Awards Act. *Webb v. Dyer County Bd. of Ed.*, 471 U.S. 234, 243, 85 L. Ed. 2d 233, 105 S. Ct. 1923 (1985). However, the trial court did not rule as a matter of law that presettlement fees were not *eligible* for reimbursement; rather, it found they should not be reimbursed under the facts of this case.

The trial court's decision regarding the amount of fee reimbursement is subject to the more deferential abuse of discretion standard of review. See *Webb*, 471 U.S. at 242-44; *Carter v. Sedgwick County, Kan.*, 929 F.2d 1501, 1506 (10th Cir. 1991). An appellate court has a duty to affirm those awards which fall within the broad discretion of the trial court, but it must remand the case where the trial court applies the wrong standard such that the award is inadequate as a matter of law. *Daly v. Hill*, 790 F.2d 1071, 1085 (4th Cir. 1986).

In light of this standard of review, we reverse the trial court's exclusion of *all* work that preceded the settlement negotiations and remand for a determination of the reasonable amount of fees to be awarded.

Our resolution of this issue is aided by our previous statements of when attorney fees may be awarded and the bounds within which a trial court may exercise discretion in making a fee award. In *Allison v. Board of Johnson County Comm'rs*, 241 Kan. 266, 273, 737 P.2d 6 (1987), in discussing the award of attorney fees under 42 U.S.C. § 1988, we stated:

"The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides:

" 'In any action or proceeding to enforce a provision of Sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C. 1681 et seq.], or title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.'

"Under 42 U.S.C. § 1988, the prevailing party should ordinarily be awarded attorney fees unless there are special circumstances making such an award unjust. A person is a 'prevailing party' within the context of 42 U.S.C. § 1988 when he essentially succeeds in obtaining the relief he seeks in his claims on the merits. *Gumbhir v. Kansas State Board of Pharmacy*, 231 Kan. 507.

"For a party to 'prevail,' a judicial determination is not necessary. Parties are considered to have prevailed when they vindicate a right through a consent judgment, a settlement, or without formally obtaining relief. *Maher v. Gagne*, 448 U.S. 122, 129, 65 L. Ed. 2d 653, 100 S. Ct. 2570 (1980). In suits alleging § 1983 violations which result in settlements or consent decrees favorable to relief requested by the plaintiff, the district court, on a § 1988 application for attorney fees, must first determine whether the lawsuit, as a matter of law, involved the vindication of the plaintiff's rights secured by the Constitution or laws of the United States. *J & J Anderson, Inc. v. Town of Erie*, 767 F.2d 1469, 1475 (10th Cir. 1985)."

Thus, the first step in considering a request for attorney fees under 42 U.S.C. § 1988 is to determine whether the plaintiff is a "prevailing party" within the terms of the statute. The trial court held that the ability to enforce the SRS family agenda in contract was sufficient relief to classify the plaintiffs as a prevailing party. Defendant does not cross-appeal the trial court's determination that the plaintiffs were prevailing parties. This issue is therefore resolved in the plaintiffs' favor as the law of this case. The plaintiffs were and are "prevailing parties."

If the party seeking fees under 42 U.S.C. § 1988 is proved to be a prevailing party, as the trial court found here, and thus eligible for attorney fees under the statute, the court should award fees in a civil rights action unless special circumstances would make such an award unjust. *Blanchard v. Bergeron*, 489 U.S. 87, 96, 103 L. Ed. 2d 67, 109 S. Ct. 939 (1989). The relevant question becomes the reasonable amount of the award:

"Attorney fees are awarded only to counsel of the prevailing parties. The attorney for the prevailing party is then entitled to a reasonable fee set by the court. The

factors to be considered include: (1) the number of hours spent on the case by the various attorneys and the manner in which they were spent; (2) the reasonable hourly rate for each attorney; (3) the extent, if any, to which the quality of the attorney's work mandates increasing or decreasing the amount to which the court has found the attorney reasonably entitled; and (4) the benefit produced by the lawsuit . . . ." *Allison*, 241 Kan. at 278.

Where the trial court calculates the reasonable fees using these factors, its conclusion will be reviewed only for an abuse of discretion. However, in this case, rather than simply applying these factors to figure the amount of fees due the plaintiffs, the trial court excluded *all* fees for work done prior to settlement.

The trial court attempted to justify the denial of fees for presettlement work by saying it added little to the case. However, the record presented to us clearly shows that legitimate claims were made based on then-existing (although later reversed) United States District and Circuit Court of Appeals rulings and that the pleadings, motion practice, and discovery provide *some* basis for the settlement which was ultimately reached.

In determining the reasonable amount of fees to be awarded, the court should exclude hours which were not reasonably expended on the litigation. *Blanchard*, 489 U.S. at 89 n.2. A legitimate and important factor in determining an appropriate fee is the necessity of the services for which the fee is sought. See *Stone v. City of Wichita Falls*, 668 F.2d 233, 234 (5th Cir. 1982). "If the court has the impression that a plaintiff spent an excessive amount of lawyer time and simply overwhelmed the defendant in a case in which the litigation onslaught was unnecessary, the court should consider this factor in determining what amount of time was reasonably expended in the litigation." *Ramos v. Lamm*, 713 F.2d 546, 557 (10th Cir. 1983).

However, in computing the fee, the court should compensate the prevailing party for all time that *is* reasonably expended in advancing the successful claims, so that the fee reflects the "reasonable worth of the services rendered in vindication of a plaintiff's civil rights claim." *Blanchard*, 489 U.S. at 96.

The reasonable fee award usually is calculated as the product of the time reasonably expended and the prevailing rate. The United

States Supreme Court has approved the use of 12 factors in adjusting the fee award so calculated to arrive at a final determination of the reasonable fee:

"(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Blanchard*, 489 U.S. at 91 n.5.

The trial court may award attorney fees substantially less than those actually incurred where the degree of the plaintiff's success is disproportionate to fees requested or the level of success is not high.

"Once civil rights litigation materially alters the legal relationship between the parties, 'the degree of the plaintiff's overall success goes to the reasonableness' of a fee award under *Hensley v. Eckerhart*, 461 U.S. 424[, 76 L. Ed. 2d 40, 103 S. Ct. 1933] (1983). [Citation omitted.] Indeed, 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.' *Hensley*, supra, at 436. . . . We have already observed that if 'a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.' *Hensley*, supra, at 436." *Farrar v. Hobby*, 506 U.S. 103, 114, 121 L. Ed. 2d 494, 113 S. Ct. 566 (1992).

In *Texas Teachers Assn. v. Garland School Dist.*, 489 U.S. 782, 789-90, 103 L. Ed. 2d 866, 109 S. Ct. 1486 (1989), the United States Supreme Court explained:

"Where the plaintiff's claims are based on different facts and legal theories, and the plaintiff has prevailed on only some of those claims, we indicated that '[t]he congressional intent to limit [fee] awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.' [Citation omitted.] In the more typical situation, where the plaintiff's claims arise out of a common core of facts, and involve related legal theories, the inquiry is more complex. In such a case, we indicated that 'the most critical factor is the degree of success obtained.' [Citation omitted.] We noted that in complex civil rights litigation, 'the plaintiff often may succeed in identifying some unlawful practices or conditions,' but that 'the range of possible success is vast,' and the achievement of prevailing party status alone 'may say little about whether the expenditure of

counsel's time was reasonable in relation to the success achieved.' [Citation omitted.] We indicated that the district courts should exercise their equitable discretion in such cases to arrive at a reasonable fee award, either by attempting to identify specific hours that should be eliminated or simply reducing the award to account for the limited success of the plaintiff."

See *Cunningham v. County of Los Angeles*, 859 F.2d 705, 711-13 (9th Cir. 1988).

In *Poston v. Fox*, 577 F. Supp. 915, 921-22 (D.N.J. 1984), the prevailing plaintiff's attorney fees were reduced by 40 percent because the benefits of the litigation over prison conditions did not merit the entire award. See also *Sanders v. Brewer*, 972 F.2d 920, 922-23 (8th Cir. 1992) (fees reduced nearly by half where damages totalled $11). Similarly, in *Knop v. Johnson*, 712 F. Supp. 571, 575-77 (W.D. Mich. 1989), even though the claims were factually related where the plaintiff class prevailed only in part, the fee award was reduced proportionately.

In the present case, any reduction based on claims that were dismissed, an excessive amount of time expended by the plaintiffs, or the plaintiffs' limited success is within the discretion of the trial court. However, the trial court clearly abused that discretion by excluding all presettlement time, including that spent drafting petitions, motions, and oppositions to motions, without which the case would never have reached the settlement stage.

The court need not engage in an hour-by-hour analysis of a voluminous record of billing statements to determine the reasonable hours compensable under 42 U.S.C. § 1988, but their reduction must be concisely and clearly explained so that a reviewing court may determine if the reduction is justified. See *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994).

While the trial court might properly determine that many of the hours spent by the plaintiffs' attorneys prior to settlement were not "reasonably expended" or that the plaintiffs' limited success in actualizing substantial change merited a reduced award, the trial court erred in eliminating all time expended prior to settlement negotiations. Therefore, we remand the case to the trial court to determine the reasonable attorney fees for the presettlement effort and service reasonably expended.

*Did the trial court err in denying the plaintiffs reimbursement for expenses?*

We find the trial court erred as a matter of law in denying the plaintiffs' entire claim for expenses and remand the case for a determination of what expenses were reasonable.

A prevailing plaintiff in a civil rights case is ordinarily entitled to recover compensation for expenses reasonably incurred in preparing the case. *Daly v. Hill*, 790 F.2d 1071, 1084 (4th Cir. 1986); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), *amended on other grounds* 808 F.2d 1373 (9th Cir. 1987); see *Allison*, 241 Kan. at 278. Expenses are part of the reasonable attorney fees:

"Clearly, a 'reasonable attorney's fee' cannot have been meant to compensate only for work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of an attorney. Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit." *Missouri v. Jenkins*, 491 U.S. 274, 285, 105 L. Ed. 2d 229, 109 S. Ct. 2463 (1989).

As we said in *Allison*, 241 Kan. at 278:

"Items that are normally itemized and billed in addition to the hourly rate should be included in fee allowances in § 1983 claims if reasonable in amount. Expenses for long-distance telephone charges, copying costs, and other expenses should be allowed as fees only if the expenses are usually charged separately in the area. Out-of-pocket costs not normally absorbed as part of law firm overhead may be reimbursed."

The trial court denied all the plaintiffs' claimed expenses without explanation. Under the facts of this case, such is not justified. See *Bergquist v. County of Cochise*, 806 F.2d 1364, 1371 (9th Cir. 1986); *Durett v. Cohen*, 790 F.2d 360, 363 (3d Cir. 1986). While it may be that the typical practice in the relevant area is that such costs are absorbed as part of the firms' overhead, and thus incorporated in the hourly rates and not separately recovered, the trial court made no such finding. See *Ramos v. Lamm*, 713 F.2d at 559.

On remand, the trial court must determine what expenses are reasonable, applying the same guidelines as govern the reasonable

amount of attorney fees in light of the typical billing practices in the relevant area.

*Did the trial court err in awarding fees for the plaintiffs' lead counsel at local rates rather than those prevalent in New York?*

We affirm the trial court's decision to base the attorney fees paid to the plaintiffs' lead counsel on local market rates.

The market rate on which an award of attorney fees will be based is in the sound discretion of the trial court and is subject to review only for an abuse of that discretion. See *Wayne v. Village of Sebring*, 36 F.3d 517, 530 (6th Cir. 1994); *Gates v. Deukmejan*, 987 F.2d 1392, 1405 (9th Cir. 1993). " '[R]easonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel." *Blum v. Stenson*, 465 U.S. 886, 895, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984). The relevant community is that of the forum, in the absence of unusual circumstances. See *Ramos v. Lamm*, 713 F.2d at 555.

The fee applicant has the burden to justify the rate sought:

"To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11.

Some courts have permitted the award of attorney fees to reflect higher out-of-town rates where the plaintiff establishes that qualified counsel are not locally available. See *Gates*, 987 F.2d at 1405; *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1454 (D. Kan. 1987), *aff'd in part and remanded in part* 899 F.2d 951 (10th Cir.), *cert. denied* 497 U.S. 1005 (1990). Nevertheless, the trial court's broad discretion to determine what constitutes a reasonable hourly rate is not abused by applying local market rates, even when the fee claimant produces some evidence no local attorney was willing to take the case. *Wayne*, 36 F.3d at 533.

In another recent case, Judge Rogers found that Christopher Hansen's expertise in complex civil rights cases was not so unique that adequate local counsel were unavailable in Topeka. *Brown v.*

*U.S.D. No. 501, Shawnee County, Kan.*, 878 F. Supp. 1430, 1432-34 (D. Kan. 1995). In addition, Judge Rogers reasoned: "[I]t does not seem logical that the relevant community for determining the market rate for counsel should be decided by the location of the headquarters of the organization advancing money for the lawsuit." 878 F. Supp. at 1435. He also said: "The court firmly believes the local bar was competent to tackle whatever factual and legal difficulties this case presented. In fact, local attorneys have represented plaintiffs since the beginning of this case. Local attorneys alone have represented defendant." 878 F. Supp. at 1433.

We agree with Judge Rogers' assessment of the local market. The trial court did not err in basing the plaintiffs' lead counsel fee awards on prevailing local market rates.

Although the plaintiffs submitted evidence that some attempts by Netherton to secure qualified local counsel were unsuccessful, the defendant submitted contrary evidence and the trial court was not persuaded such local counsel were unavailable. The trial court did not abuse its discretion.

*Did the trial court err in reducing the number of hours of the plaintiffs' lead counsel for which fees would be awarded while awarding fees of local attorneys for all hours submitted?*

The trial court reduced the hours of Hansen, Dunn, and Lowry which could have been included in an attorney fee award. It based the reduction on the attorneys' insufficient recording of the tasks they worked on, their duplicative efforts, time unrelated to this litigation, and time spent on travel. We affirm the trial court's decision on this issue.

The addition of co-counsel to an action already initiated warrants careful scrutiny for duplicative effort, which should not be charged to the losing party. *Hinkle v. Christensen*, 548 F. Supp. 630, 632-33 (D.S.D. 1982). The unnecessary use of multiple attorneys justifies a reduction in the fee award to reflect the duplication. See *Daly v. Hill*, 790 F.2d at 1080. In addition, the fees due prevailing plaintiffs may be reduced for duplicative time, excessive review time, nonproductive travel time, time spent on issues on which plaintiff does not prevail and clerical time. See *Goodwin v. Metts*,

973 F.2d 378 (4th Cir. 1992); *Jane L. v. Bangerter*, 828 F. Supp. 1544 (D. Utah 1993); *Hart v. Bourque*, 608 F. Supp. 1091 (D. Mass. 1985), *rev'd on other grounds* 798 F.2d 519 (1st Cir. 1986).

In *DeGidio v. Pung*, 920 F.2d 525, 533 (8th Cir. 1990), the trial court did not err in reducing the fee requested by 65 percent where plaintiff's time records were deficient and success was limited. Although the lawsuit served as a catalyst for remedial action, constitutional violations were remedied before the start of the trial.

Where billing records contain insufficient detail, the amount requested may be reduced significantly. *Lipsett v. Blanco*, 975 F.2d 934, 937-38 (1st Cir. 1992).

The plaintiffs argue the trial court was discriminatory in reducing only the hours of out-of-state attorneys based on the vagueness of their billing statements. The trial court found the billing statements of Netherton and Waxse to be reasonable in light of the extent of their involvement in the case and their importance to its resolution. The trial court did not find the hours spent by other counsel to be reasonable, and the billing statements were insufficiently detailed to establish their reasonableness.

The plaintiffs bore the burden to establish the claimed hours were reasonable. *Brown*, 878 F. Supp. at 1436. Further, the plaintiffs have the burden of establishing that the trial court abused its discretion. *In re Application of City of Great Bend for Appointment of Appraisers*, 254 Kan. 699, 707, 869 P.2d 587 (1994). The mere disparity in the number of billable hours of each attorney that was held sufficiently proven does not establish an abuse of discretion in light of the varying number of hours claimed, varying duties, and varying methods of recording billable time. The record presented to us does not require the reversal of the trial court as to the amount of attorney fees awarded to plaintiffs' lead counsel in the settlement phase of this litigation. The trial court did not abuse its discretion as to this issue.

Affirmed in part, reversed in part, and remanded for further determinations in accordance with this opinion.