UNITED PHOSPHORUS, LTD., Plaintiff,

v.

MIDLAND FUMIGANT, INC., Defendant.

UNITED PHOSPHORUS, LTD. and Inventa Corporation, Plaintiffs,

v.

MIDLAND FUMIGANT, INC., Donald F. Fox, Phos–Fume Chemical Company and Kaw Valley, Inc., Defendants.

Civil Action Nos. 91–2133–GTV, 95–2267–GTV.

United States District Court, D. Kansas.

Aug. 28, 1998.

Kathryn B. Bussing, Shelley A Runion, Blackwell Sanders Peper Martin LLP, Kansas City, MO, James M. Warden, Blackwell Sanders Peper Martin LLP, Overland Park, KS, for Plaintiff for case no. 91–2133–GTV.

John C. Tillotson, Murray, Tillotson & Nelson, Chtd., Leavenworth, Richard P. Stitt, Spencer, Fane, Britt & Browne, Kansas City, MO, D.A.N. Chase, Chase & Yakimo, Overland Park, KS, for Defendant for case no. 91–2133–GTV.

Floyd R. Finch, Jr, Shelley A Runion, Blackwell Sanders Peper Martin LLP, Kansas City, MO, for Plaintiff for case no. 95–2267–GTV.

John C. Tillotson, Murray, Tillotson & Nelson, Chtd., Leavenworth, KS, for Defendants for case no. 95–2267–GTV.

## MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

This case is before the court on plaintiffs' motion for attorney fees and expenses (Doc. 362) pursuant to section 35 of the Lanham Act, 15 U.S.C. § 1117(a). For the reasons set forth below, the motion is granted in the amount of $313,133.27.

### I. Background

United Phosphorus, Ltd. ("United") originally filed this trademark infringement action against Midland Fumigant, Inc. ("Midland") in April 1991 alleging that Midland had infringed United's Quick–Phos mark, fraudulently registered a trademark with the United States Patent and Trademark Office, and engaged in unfair competition (case number 91–2133). Although the parties settled the dispute in October 1991, Judge Earl E. O'Connor vacated the settlement agreement in January 1995 after concluding that Midland had not performed according to the terms of the agreement. Five months later, United and its subsidiary, Inventa Corporation ("Inventa"), filed a second lawsuit against Midland, Phos–Fume Chemical Company, Kaw Valley, Inc., and Donald Fox, the president of the three corporations (case number 95–2267). In the June 1995 case, which the court consolidated with the revived April 1991 suit, plaintiffs asserted claims of common law fraud and Racketeer Influenced and Corrupt Organizations Act ("RICO") violations.

On October 22, 1997, after a two and one-half week trial, the jury returned a verdict in favor of United on the company's trademark infringement, fraudulent trademark registration, and unfair competition claims against Midland. The jury awarded $761,866 in damages on those claims. The jury also determined that Donald Fox had engaged in fraudulent conduct against United and Inventa and awarded the two companies $1,314,063 in compensatory damages on the fraud claim.[1] (The court later reduced the compensatory fraud damages to $67,694.03 in response to defendants' motion for judgment as a matter of law.) Upon the jury's recommendation, the court, acting pursuant to Kansas law, then assessed $653,217 in puni-

tive damages against Fox. Plaintiffs, having exhausted the requisite consultations, see D. Kan. Rule 54.2, now move to recover the attorney fees they incurred during the course of this litigation.

### II. Right to Attorney Fees

Plaintiffs predicate their attorney fee request on section 35 of the Lanham Act, 15 U.S.C. § 1117(a). This statute provides, in relevant part, that when a trademark infringement violation under 15 U.S.C. § 1125(a) has been established in a civil action, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." It is undisputed that United's favorable verdict on its trademark infringement claim renders it a prevailing party under § 1117(a). Defendants insist, however, that this lawsuit does not represent an "exceptional case" implicating an award of attorney fees.

An "exceptional case" under § 1117(a) is one in which the defendant's "trademark infringement can be characterized as malicious, fraudulent, deliberate, or willful." *VIP Foods, Inc. v. Vulcan Pet, Inc.*, 675 F.2d 1106, 1107 (10th Cir.1982) (citing S.Rep. No. 93–400 (1973), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7133). The Tenth Circuit has determined that at the heart of every § 1117(a) attorney fee award is an "implicit recognition that some degree of bad faith [has] fuel[ed] the infringement at issue." *TakeCare Corp. v. Takecare of Okla., Inc.*, 889 F.2d 955, 957 (10th Cir.1989).

Plaintiffs presented ample proof of Midland's bad faith in this action. The evidence established conclusively that Midland deliberately relabeled its "L–Fume"—an aluminum phosphide product of inferior quality—as "Quick–Phos" to deceive its customers and take unfair advantage of the prominent Quick–Phos name. As the court has observed on several occasions, Midland's explanations for its conduct lacked credibility and the testimony of its representatives was often less than truthful. The actions of Midland's president, Donald Fox, were particularly egregious. Despite clear knowledge of Unit-

---

1. The jury concluded that defendants had not committed any RICO violations.

ed's ownership of the Quick–Phos mark and repeated warnings to cease his infringing activities, Fox instructed his subordinates to sell low-grade aluminum phosphide under a Quick–Phos label. Fox even went so far as to file an application on behalf of Midland with the United States Patent and Trademark Office to register the Quick–Phos mark as its own, in the process neglecting to disclose United's prior use of the mark. In sum, Midland's trademark infringement is easily characterized as malicious, fraudulent, deliberate, and willful.[2]

Citing *The Post Office v. Portec, Inc.*, 913 F.2d 802, 812 (10th Cir.1990), *vacated on other grounds*, 499 U.S. 915, 111 S.Ct. 1299, 113 L.Ed.2d 235 (1991), defendants maintain that the absence of a specific finding of willfulness or bad faith by the jury precludes an attorney fee award. The court disagrees. Although the *Portec* jury indicated in response to a special interrogatory that the defendant's trademark infringing activities were willful and intentional, nothing in that opinion *requires* such a finding by a jury before attorney fees can be awarded. *See generally Gorenstein Enters., Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 435–36 (7th Cir. 1989) (upholding district court's attorney fee award in apparent absence of specific finding of willfulness by jury); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1026–27 (9th Cir.1985) (same); *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 550–51 (7th Cir.1982) (same). By its express language, in fact, § 1117(a) appears to contemplate the *court* making the requisite assessment whether the case is sufficiently "exceptional" to justify an award of attorney fees. Legislative history bolsters this conclusion. Seeking to abrogate the Supreme Court's holding in *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), Congress amended the Lanham Act in 1975 to permit the award of attorney fees in exceptional cases. *See Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 528 (10th Cir.1987) (citing Act of Jan. 2, 1975, Pub.L. No. 93–600, § 3, 88 Stat.1955, 1955). The Senate Report accompanying this bill observed that "[i]t would be unconscionable not to provide a complete remedy including attorney fees for acts which *courts have characterized* as malicious, fraudulent, deliberate, and willful. The proposed amendment would limit attorney fees to 'exceptional cases' and *the award of attorney fees would be within the discretion of the court.*" S.Rep. No. 93–400 (1973), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7136 (emphasis added). This action represents the quintessential "exceptional case" and attorney fees are clearly warranted.

### III. Reasonable Attorney Fee Award

The determination of what constitutes a reasonable attorney fee involves a two-step process. First, the court must ascertain the number of hours reasonably expended by plaintiffs' attorneys over the course of the litigation and multiply it by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This figure is frequently referred to as the "lodestar." *See City of Riverside v. Rivera*, 477 U.S. 561, 568, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). Second, the court must consider whether an adjustment should be made to the lodestar. *Id.*

### A. Hourly Rates

The reasonable hourly rate is established by looking to the prevailing rates of local attorneys of comparable skill and experience in the subject matter of this litigation.[3] *See Ramos v. Lamm*, 713 F.2d 546, 555 (10th

---

**2.** Defendants' protestations notwithstanding, the Tenth Circuit's *TakeCare* opinion offers Midland no refuge. Midland never raised the "advice of counsel" defense around which the *TakeCare* panel centered its analysis.

**3.** The court subscribes to the reasoning of Judge Lung-strum with respect to the term "reasonable" in the hourly rate context. As he recently observed, the term "seems to imply that, by definition, any other rate actually charged to a client is somehow unreasonable or unfair. That,

of course, is not the case. The factors that go into the setting of rates by attorneys are likely to differ based on numerous considerations, and private parties are certainly entitled to strike whatever bargain on rates that proves mutually agreeable." *Medlock v. Ortho Biotech, Inc.*, No. 94–2317, 1997 WL 51216, at *2 n. 3 (D.Kan. Jan. 14, 1997). The court thus uses the phrase "reasonable hourly rate" only within "its customary meaning as a term of art," *id.*, and not as a criticism of plaintiffs' billing practices.

Cir.1983). In formulating this figure, district judges may look to their "own knowledge of prevailing market rates as well as other indicia of a reasonable market rate." *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1493 (10th Cir.1994). The hourly rates set by the court should reflect rates in effect at the time the fee is being established rather than those in effect at the time the relevant services were performed. *Ramos,* 713 F.2d at 555.

■ The most appropriate means by which to fashion hourly rates is to examine various attorneys' roles in the litigation. This case can be categorized into two phases. The first phase commenced with the preparation of United's 1991 lawsuit and roughly continued through United's discovery of Midland's breach of the settlement agreement in 1993. The second phase began soon after United discovered Midland's misconduct and attempted to reopen the 1991 litigation. Plaintiffs utilized Bruce Campbell as lead counsel in phase one and Floyd Finch as lead counsel in phase two. In light of the court's own familiarity with the relevant rates in this community, each lead counsel shall receive $150/hour. All other attorneys shall be compensated at $125/hour unless a lower figure has been requested. Paralegals and staff are entitled to $50/hour. The court will reimburse plaintiffs' document clerk's hours at $25/hour.

## B. Reasonable Hours [4]

The parties dispute the scope of plaintiffs' attorney fee entitlement. Defendants insist that only those hours spent working on United's trademark infringement claim may be recovered. Plaintiffs respond that all hours save those expended exclusively on unsuccessful claims and damage requests are reimbursable.

■ Attorney fee requests tied to 15 U.S.C. § 1117(a) may be granted only to the extent the work was "performed in connection with claims filed under the Lanham Act." *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1193 (6th Cir. 1997). The only Lanham Act claim authorizing attorney fees in this case is United's trademark infringement cause of action.[5] *See* 15 U.S.C. § 1125(a). Plaintiffs maintain, however, that the Tenth Circuit permits the recovery of attorney fees for non-Lanham Act claims if the hours invested on such matters were inextricably intertwined with the pursuit of Lanham Act claims. *See Portec,* 913 F.2d at 812–13. Plaintiffs read the circuit precedent too broadly. In *Portec,* the Tenth Circuit upheld the attorney fee award only after specifically referencing the district court's twenty-percent reduction for non-Lanham Act claims. *Id.* at 813. The circuit did not suggest that attorney fees could be awarded for claims not arising under the Lanham Act. Moreover, other than United's unfair competition cause of action, none of plaintiffs' claims were so tightly bound to the trademark infringement claim that the court could characterize the hours expended on each as pivotal to infringement issues. Accordingly, the court will not reimburse plaintiffs' attorneys for fees and expenses incurred prosecuting any matter other than United's trademark infringement claim except to the limited extent that hours consumed on the unfair competition cause of action cross-fertilized the trademark infringement claim.[6] The most effective way to insure that overcompensation does not occur is to heed the logic of *Portec* and reduce counsel's reasonable hours and expenses by twenty-percent. (The court will impose this reduction after eliminating all "unreasonable" billings.)

■ Plaintiffs claim to have deleted all billing entries that are related to their unsuccessful RICO claim as well as their requests for prejudgment interest and treble dam-

---

4. *See supra* note 3.

5. Although plaintiffs filed their "fraud upon the Trademark Office" claim under section 38 of the Lanham Act, 15 U.S.C. § 1120, attorney fees are not recoverable for violations of that particular statute. *See Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 876–77 (8th Cir.1994).

6. Not only was plaintiffs' fraud claim discrete from United's trademark infringement cause of action, but their damages on that claim amounted only to the attorney fees they incurred in reopening United's 1991 litigation. Awarding attorney fees on the fraud claim for any time spent prior to the rejuvenation of United's 1991 lawsuit, therefore, would constitute a double recovery.

ages. The court finds a certain disharmony, however, in the fact that plaintiffs allocated only $48,000 of their $961,000 in fees to RICO issues. Plaintiffs must have consumed inordinate amounts of time preparing their RICO claims. As defendants correctly note, nearly half of plaintiffs' Final Pretrial Order claim summary is devoted to their RICO cause of action. In addition, a large portion of plaintiffs' trial presentation focused on their attempt to prove more than 300 counts of mail and wire fraud. Almost one-third of the jury instructions, in fact, relate to plaintiffs' RICO claim. The court remains convinced that not all time spent on RICO matters is specifically delineated as such in plaintiffs' billing records. The mere deletion of *entries* does not translate into the full deletion of relevant *hours*. As the Tenth Circuit recently held, a litigant may not recover any fees attributable to an unsuccessful claim merely because he grouped work related to successful and unsuccessful claims together and failed to identify the number of hours expended on each. *Suiter v. Mitchell Motor Coach Sales, Inc.*, 151 F.3d 1275, 1287–88 (10th Cir.1998).

After reviewing plaintiffs' billing statements, the court finds it nearly impossible to ascribe the number of hours spent on discrete activities and claims. The court afforded plaintiffs an opportunity to correct this problem by issuing an Order on June 5, 1998 directing them to document "the hours each attorney and litigation support staff member spent on particular tasks in support of successful claims." Plaintiffs failed to provide this information.[7] Billing records must "explain how the hours worked were 'allotted to specific tasks—for example, how many hours were spent researching, how many interviewing the client, how many drafting the complaint, and so on.'" *Sussman v. Patterson*, 108 F.3d 1206 (10th Cir.1997) (quoting *Ramos*, 713 F.2d at 553). It is the duty of neither the defendants nor the court to pore through nearly 500 pages of invoices in an attempt to calculate the hours reasonably spent on different activities and claims. To the contrary, the burden rests with plaintiffs' counsel "to prove and establish the reason-

ableness of each dollar, each hour, above zero." *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir.1986). Substantial deductions are in order.

■ The court believes that plaintiffs' counsel overstaffed this case. They seek fees for seven partners, thirty-two associates, one summer law clerk, ten paralegals, and one document clerk. Many of these individuals spent only a handful of hours on the case. Such work could, and should, have been done by the core group of attorneys and staff handling the litigation. "There is a difference between assistance of co-counsel which is merely comforting or helpful and that which is essential to proper representation." *Mares*, 801 F.2d at 1206. Individuals whose role in this lawsuit can be characterized as minimal, which the court defines here as billings of less than forty hours, will receive no fees.

The court further finds that the attorneys and staff who handled the bulk of the work in this action billed for an excessive number of hours. The Supreme Court has observed:

> Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.

*Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Thus, in examining a fee applicant's requested hours, the court must "distinguish 'raw' time from 'hard' or 'billable' time to determine the number of hours reasonably expended." *Ramos*, 713 F.2d at 553. This is particularly important in fee-shifting cases because "[l]awyers charging fees to adversaries rather than clients may be less likely to carefully scrutinize the hours spent to determine if payment for the task performed is justified." *Id.* at 554.

■ Hours billed for research on trademark issues designed to familiarize firm attorneys with that area of jurisprudence are

---

**7.** Plaintiffs blame many of their billing problems on their law firm's computer system. Neither the court nor the defendants, however, are re-

sponsible for any systemic deficiencies in counsel's billing department.

properly allocated to general overhead and will not be reimbursed. *See id.* at 554. Similarly, hours spent traveling may not be recovered unless such time was spent working on aspects of the case. *See Smith v. Norwest Fin. Acceptance Corp.,* 129 F.3d 1408, 1418–19 (10th Cir.1997); *Jane L. v. Bangerter,* 61 F.3d 1505, 1510 (10th Cir.1995). In addition, while the court commends Mr. Finch for his generally detailed billing entries, many of the firm's attorneys and staff offered only vague descriptions of their activities, providing little or no insight into the reasonableness of their fee request. Statements such as "index and organize documents," "work on various motions and pleadings," "sort documents," "meet with client," and "prepare exhibits" do not sufficiently articulate the nature of plaintiffs' time allocations. *See Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. 1933 (at minimum, counsel must identify the general subject matter of time expenditures). Further, on numerous occasions, attorneys billed for activities such as payment schedules and meeting arrangements that could have been performed by the firm's staff. *See New Mexico Citizens for*

*Clean Air & Water v. Espanola Mercantile Co.,* 72 F.3d 830, 835 (10th Cir.1996) ("When a lawyer spends time on tasks that are easily delegable to non-professional assistance, legal service rates are not applicable.") (citations omitted). Finally, plaintiffs' attorneys seek reimbursement for a significant number of hours spent on matters that had no relevance to this dispute. For example, their request encompasses all research on venue transfer issues, counterclaim litigation strategies, additional fraud claims, bankruptcy discharge issues,[8] and research as to the proclivities of various judges in this district. The court will not require defendants to bear the cost of such research.

The court need not identify and justify each disallowed hour. *Mares,* 801 F.2d at 1202. Nor must the court designate a certain number of hours that will be reimbursed for discrete legal tasks. *Id.* The court may simply make a general reduction in the hours claimed in order to arrive at a reasonable fee. *Id.* at 1203. Taking into account the reductions for unreasonable billings, the court finds that the following *pre-discounted* fees are appropriate here:

| Staff Member | Hrs Requested | Hrs Awarded | Hourly Rate | TOTAL FEE |
|---|---|---|---|---|
| Brennan | 141.4 | 105.75 | $ 25 | $ 2,643.75 |
| Bussing | 142.2 | 106.5 | $122 | $ 12,993.00 |
| Campbell | 48.4 | 48 | $150 | $ 7,200.00 |
| Finch | 1635.4 | 800 | $150 | $120,000.00 |
| Foss | 349.3 | 263 | $ 95 | $ 24,985.00 |
| Griffin | 72.7 | 54 | $ 50 | $ 2,700.00 |
| High | 146.9 | 110.25 | $106 | $ 11,686.50 |
| Jacob | 284.8 | 213 | $118 | $ 25,134.00 |
| Kline | 140.4 | 105 | $125 | $ 13,125.00 |
| Marsh | 110.2 | 83 | $117 | $ 9,711.00 |
| Runion | 948.7 | 800 | $125 | $100,000.00 |
| Stock | 254.6 | 191 | $ 50 | $ 9,550.00 |
| Sumners | 78.8 | 58.5 | $ 95 | $ 5,557.50 |
| Webb (Fox) | 1400.4 | 800 | $ 50 | $ 40,000.00 |
| **TOTALS** | 5754.2 | 3738 | | $385,285.75 |

The court now subtracts twenty percent of this $385,285.75 figure ($77,057.15) for time

that, although reasonable in amount, was expended on claims to which plaintiffs have no

8. Contrary to Mr. Finch's affidavit, plaintiffs' fee request deductions do not account for all billings

related to bankruptcy discharge matters.

right to an attorney fee recovery under 15 U.S.C. § 1117(a). Accordingly, the court awards plaintiffs $308,228.60 in attorney fees.

## C. Expenses

■ Although only items specifically described as taxable under 28 U.S.C. § 1920 may be awarded as costs, other out-of-pocket expenses incurred during a lawsuit may be reimbursed as part of an attorney fee award if "(1) the expenses are not absorbed as part of a law firm overhead but are normally billed to a private client, and (2) the expenses are reasonable." *Bangerter,* 61 F.3d at 1517. Plaintiffs have not bothered to segregate or tally any of their requested expenses. They simply fastened together forty-one invoices and claimed that the expenses totaled $147,-664.51. Dumping billing statements on the court is not an adequate means of supporting the expenses component of an attorney fee request. The court would be well within its discretion to deny plaintiffs' expenses altogether. Nevertheless, out of a concern for fairness, the court has attempted to distill the invoices and calculate totals for each category of expenditures in plaintiffs' fee application. If the court has inadvertently omitted a category or committed a computational error in defendants' favor, plaintiffs have only themselves to blame.

### 1. Expert Witness Fees

■ Plaintiffs seek $80,924.21 in expert witness fees. None of these fees are recoverable under 15 U.S.C. § 1117(a). In *West Virginia Univ. Hosp., Inc. v. Casey,* 499 U.S. 83, 86–88, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), the Supreme Court held that, absent explicit statutory authority to the contrary, the reimbursement of expert witness fees is confined to the limits set forth in 28 U.S.C. § 1821. Expert witness fees are not a component of attorney fees. *Id.* at 88. Because the Lanham Act confers no authority upon the court to exceed § 1821's caps, plaintiffs' expert witness fee request is limited to the per diem and incidental expenses sanctioned by § 1821.[9] *See BASF Corp. v. Old World*

*Trading Co.,* 839 F.Supp. 528, 531–33 (N.D.Ill.1993), *aff'd,* 41 F.3d 1081 (7th Cir. 1994); *Manildra Milling Corp. v. Ogilvie Mills, Inc.,* 820 F.Supp. 1330, 1332–33 (D.Kan.), *rev'd on other grounds,* Nos. 92-1462 & 92–1480, 1993 WL 217173, at *9 (Fed.Cir. June 22, 1993); *Nugget Distribs. Co-op. of Amer., Inc. v. Mr. Nugget, Inc.,* 145 F.R.D. 54, 59 (E.D.Pa.1992). Plaintiffs may recover their authorized expert witness fees by filing a bill of costs within the time period designated by D. Kan. Rule 54.1(a).

### 2. Computerized Support Services

■ Plaintiffs also request $13,669.41 in "computerized support services." This figure is unreasonable. First, a significant amount of research was conducted on matters of little relevance to this lawsuit. The court, for example, will not reimburse time spent surveying conversion and trespass jurisprudence. In addition, plaintiffs identified many of their entries with such notations as "pull recent cases," "obtain cases," "shephardize cases," and "legal research." These broad statements give the court no clue as to the subject matter of the research. Third, plaintiffs conducted large amounts of computer research familiarizing themselves with the general areas of law at issue in the case. As the court noted earlier, such expenditures are properly attributable to a firm's overhead and are not reimbursable. Finally, plaintiffs billed for grossly excessive computer use on multiple occasions. They seek nearly $1200 for their inquiries into constructive trust matters yet offered only scant analysis of the issue in their pleadings. They also demand reimbursement for more than $1000 attributed to examining cases on the belated disclosure of witnesses and almost $800 researching the "law of the case" doctrine. It is clear that plaintiffs failed to employ cost-effective methods in their legal research. Much of the work could, and should, have been done with West's Reporters rather than on-line. The court, therefore, will award plaintiffs only $3417.35 for "computerized support services."

---

**9.** The court declines plaintiffs' invitation to invoke its inherent authority to award additional expert witness fees.

### 3. Long Distance

Plaintiffs also request $1,274.42 in long distance expenses. The court finds this figure reasonable.

### 4. Telecopies/Telefacsimiles

Plaintiffs further seek $945.25 in telecopy costs. Their billing records indicate that they charged $1/page for all faxes. The court finds this figure excessive and unwarranted. First, many of the faxes appear to have been followed up with a mailing. Second, the only cost associated with a telefacsimile, other than the machine itself, is the long distance charges necessary to transmit the information. Plaintiffs' long distance charges already have been reimbursed in the preceding paragraph and the cost of the fax machine is not only part of their firm's overhead, but can be amortized over a handful of years. Accordingly, the court will not include any of plaintiffs' fax billings in their attorney fee award.

### 5. Postage/Overnight Delivery

The next item in plaintiffs' fee application is $678.66 in postage and overnight delivery expenses. On numerous occasions, plaintiffs utilized express overnight delivery services when far less expensive methods could have been employed. Many of the express packages directed to clients and the court, for example, need not have been sent by such expedited means. If last-minute deadlines compelled overnight delivery, plaintiffs' law firm is responsible for the delays—not defendants. The court believes that plaintiffs' request must be halved and, therefore, awards $339.33 in postage/overnight delivery expenses.

### 6. Courier Delivery Services

Plaintiffs calculate their courier delivery service costs at $1007.53. This request is unreasonable. Plaintiffs billed for a sizable number of "rush deliveries." As the court noted in the preceding paragraph, however, defendants should not be held financially responsible for plaintiffs' self-imposed time constraints. Moreover, the court will not force defendants to reimburse any costs arising out of plaintiffs' deliveries of extension motions to the clerk's office or deliveries of documents between their Crown Center and Overland Park offices. Finally, it appears that plaintiffs followed up many of their courier deliveries with a mailing. The court finds that a reasonable delivery service figure is $200.

### 7. Attorney/Staff Travel

Plaintiffs expended $1498.74 in travel costs. The bulk of this expense is comprised of two $599 round-trip airline tickets to Memphis for depositions. One of the Memphis tickets, however, was used for an individual named Kelly Heisdorffer. There is no indication in the record who this person is or what role he/she played in the litigation. Because plaintiffs have failed to meet their burden of justifying this expense, the court will subtract $599 from plaintiffs' travel costs and award them only $899.74 for attorney/staff travel.

### 8. Total Expenses

Adding each of the expense categories discussed above, the court reaches a figure of $6130.84. Pursuant to the Tenth Circuit's discussion in *Portec*, 913 F.2d at 813, the court must further reduce this figure by twenty percent to account for expenses that, although reasonable, were employed in the pursuit of non-Lanham Act claims. The court, therefore, awards plaintiffs $4904.67 in total expenses.

### IV. Taxable Costs

Many of the expenses included in plaintiffs' attorney fee application are properly classified as taxable costs pursuant to 28 U.S.C. § 1920. The following costs are taxable under § 1920:(1) fees of the clerk and marshal; (2) fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and copies of papers necessarily obtained for use in the case; (5) docket fees under [28 U.S.C. § 1923]; and (6) compensation of court-appointed experts, interpreters, and salaries, fees, expenses, and costs of special interpretation services under [28 U.S.C. § 1828]. The Supreme Court underscored in *Casey* that fees falling under § 1920 may not be

recovered as general out-of-pocket expenses under a statutory fee-shifting statute. 499 U.S. at 886, 111 S.Ct. 1547 (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987)). Plaintiffs, therefore, may seek such fees only by filing a bill of costs at the time designated under D. Kan. Rule 54.1(a).

### V.  Summary

Based on the foregoing analysis, the court awards plaintiffs $308,228.60 in attorney fees and $4904.67 in expenses for a total of $313,-133.27.

IT IS THEREFORE, BY THE COURT ORDERED that plaintiffs' motion for attorney fees and expenses (Doc. 362) is granted in the amount of $313,133.27.

The case is closed.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**